505 So.2d 714 (1987)
STATE of Louisiana
v.
George E. BROOKS, Jr.
No. 86-KA-1559.
Supreme Court of Louisiana.
April 6, 1987.
Rehearing Denied May 7, 1987.
*715 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Duncan S. Kemp, III, Dist. Atty., William Quinn, Gail Sheffield, Asst. Dist. Attys., for plaintiff-appellee.
Thomas E. Foley, Gary M. Peltier, Hammond, for defendant-appellant.
CALOGERO, Justice.
George Brooks, a 37 year old man, was indicted by the Livingston Parish grand jury for the first degree murder of Joseph Cook Owen, an eleven year old boy. The jury found Brooks guilty as charged and recommended the death sentence.[1] In so recommending, the jury found the existence of two aggravating circumstances: the offender was engaged in the perpetration of an aggravated rape and an aggravated kidnapping; and the offense was committed in an especially heinous, atrocious or cruel manner. Defendant appeals the conviction and sentence. His principal contentions are that there was insufficient evidence to convict him of first degree murder or to support his sentence to death, and that his confession was obtained in violation *716 of his Fifth Amendment[2] and Miranda rights.[3]
We find defendant's assignments of error non-meritorious and thus will affirm defendant's conviction and sentence.[4]
On Saturday, July 7, 1979, a man cutting firewood in a remote area of Livingston Parish found the body of a small boy. The Livingston Parish authorities notified the East Baton Rouge Sheriff's Department. When the victim's mother filed a missing person's report on Sunday, July 8, the sheriff's department matched the two reports. The body, that of eleven year old Joseph Cook Owen, was indeed that of the missing child. That afternoon, officers canvassed the neighborhood seeking information about the child's disappearance the preceding Friday night. Although the defendant Brooks was not at home at the time, his homosexual lover, James Copeland, questioned at the residence he occupied with defendant, was the only person in the neighborhood who reported to the police that he had seen the victim on Friday evening. Copeland accompanied the officers to the police station for questioning.
While Copeland was at the station, defendant returned to the residence; and when the officers found him there, he agreed to accompany them to the police station. Later that Sunday evening, after Copeland made a statement implicating himself and Brooks in the sexual assault and murder of the victim, defendant was arrested and taken to the Baton Rouge Parish jail. The next day, after being transferred to the Livingston Parish jail, defendant made an inculpatory statement to the Livingston Parish Sheriff's Office investigators.
Brooks' statement related the following events:
Early in the preceding week, Brooks and Copeland had discussed finding a third person with whom they both could have sex. After work on Friday, July 6, Brooks went out searching in his car, leaving Copeland at the house. Brooks called home several times during the evening. During the last call, Copeland said that he had company and that Brooks should come home. When Brooks arrived home, Copeland and an eleven year old boy, Joseph Cook Owen, were in the bedroom drinking beer and smoking cigarettes.
At Copeland's suggestion, Brooks held Owen's arms, then tied him up. Copeland had anal and oral sex with Owen; Brooks also had the boy perform an act of fellatio upon him. Afterward, Owen went into the bathroom and vomited. He sat and waited, asking the men what they were going to do with him. According to Brooks, Copeland told the boy that they were going to drop him off at some distance so that it take him a long time to get back home.
Owen, who was gagged with an orange cloth and whose hands were tied, was taken to the car. Copeland took his gloves and his shotgun, using the gun to threaten Owen. Brooks drove the car to an area called Magnolia Beach in Livingston Parish. The men walked Owen to a clearing in the woods, where they untied and ungagged him and told him to sit down. While Brooks was walking toward the car, he heard a shot, looked back, and saw Copeland reload and shoot twice more.
The men ran toward the car, leaving the gun at the scene. It was stolen and thus not likely to be traced to them. They drove away, then stopped at a convenience store for a beer and coffee. After leaving the store, Brooks threw the rope and gag out of the car. They arrived home at 3 or 4 a.m. on Saturday.

*717 Assignment of Error No. 3
Brooks contends that there was insufficient evidence to find the necessary elements for conviction for first degree murder as set out in La.Rev.Stat.Ann. 14:30.[5] Defendant maintains that the evidence shows that he did little more than find himself in the company of Copeland, who committed the crimes. On the other hand, the state asserts that defendant participated at every stage in commission of the crime.
Defendant first argues that the evidence was insufficient to convict him either as the actual murderer or as a principal, specifically that there was no evidence from the state to show either that he specifically intended to kill the victim or that he aided or abetted Copeland in the killing.
Although defendant apparently did not pull the trigger, he was nonetheless charged as a principal in the first degree murder. According to La.Rev.Stat.Ann. 14:24 (West 1986), principals include "all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." However, under La.Rev.Stat.Ann. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. McAllister, 366 So.2d 1340 (La.1978). Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. In the case of a first degree murder conviction, the requisite mental state is that the defendant had the specific intent to kill. It is not enough to find merely that his accomplice had the necessary mental state, since this intent cannot be imputed to the accused. It must be shown that this accused also had the specific intent to kill. State v. Holmes, 388 So.2d 722, 726 (La.1980). However, specific intent is a state of mind and, as such, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. La.Rev.Stat.Ann. 15:445 (West 1981). The evidence of same must exclude every reasonable hypothesis of innocence. Id. 15:438.
In Holmes, the jury convicted defendant of first degree murder committed during an armed robbery (of an A & P store) in which defendant participated. Defendant had furnished the getaway car and had arranged for the shotgun which was used in the robbery. During the robbery, defendant tried to unholster the security guard's pistol. The guard realized what was happening and reached for his holster. When he moved, the other robber fired the fatal shot. Defendant then took the guard's pistol and used it to threaten and pistol-whip a customer. The majority of this Court found that the circumstantial evidence excluded all reasonable hypotheses of innocence.
The evidence at trial proved the defendant's considerable involvement in the planning and execution of the robbery. In fact, [defendant] was the one who obtained the shotgun and placed it in the car. In light of this proof, along with his acquiescence in the shooting of [the guard] and his own threats to kill, it is reasonable to infer that he intended the use of deadly force, if necessary to effectuate the robbery.
388 So.2d at 728. Defendant's conviction and sentence were affirmed. Id.
*718 In State v. Sonnier, 380 So.2d 1 (La. 1979), this Court affirmed defendant's conviction of first degree murder but reversed defendant's death sentence and instead imposed a sentence of life imprisonment without benefit of parole, probation or suspension of sentence because defendant had played only a subsidiary role in most of the aggravating circumstances and because there were a large number of mitigating circumstances. While rabbit hunting, defendant and his older brother came upon a parked car with a young couple inside. Defendant's brother handcuffed the couple together and drove their car to a deserted oil field. Both brothers raped the girl. Defendant's brother then shot the couple while defendant held the flashlight. This Court found sufficient evidence to convict defendant of first degree murder. "The defendant was present during the entire chain of events culminating in the shooting. He admitted the rape ... and held the flashlight while his brother shot the young couple." Id. at 4.
In State v. Wingo, 457 So.2d 1159 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985), this Court affirmed defendant's conviction for first degree murder and sentence to death. On Christmas Eve, defendant and another inmate escaped from jail. They broke into the victims' home, bound and gagged the victims, stole money, guns, clothing, and a car, and fatally shot the victims. They then went to defendant's relatives' home with the stolen items, telling the relatives they had robbed a house. Defendant fled into the woods and concealed items that could be identified with the victims' home. When he was captured, defendant had a pair of gloves in his possession which matched the fabric print made by a glove in the victims' home. Also a fiber from the victims' bed was found on pants that defendant had left at his relatives' home. Id. at 1164. From this sequence of events, this Court concluded that the jury could reasonably have concluded "that defendant's role was that of an equal partner in all of the crimes committed by the two during this episode, including the murders." Id. at 1165.
The proper standard of review of the sufficiency of the evidence was enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under Jackson, a reviewing court is to view "the evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789; State v. West, 408 So.2d 1302, 1304 (La.1982).
In this case there was sufficient evidence from which jurors could have concluded that defendant was an active participant, his actions directly facilitating the crimes. From defendant's own admissions, jurors learned that he held the victim's arms while Copeland undressed him. Later, defendant tied the victim with a rope and, still later, he participated in the oral sex with the unwilling boy. While defendant denied striking, threatening the victim with a shotgun or raping him (and for present purposes we assume that to be true), he clearly facilitated Copeland's behavior in this regard. Following the sexual abuse, defendant gagged the already bound child, took him to the car and drove the three of them to a spot he selected. Defendant and Copeland walked the boy 150 yards off the highway to where the killing took place. Finally, the physical evidence supports a view that one of the two men fired and reloaded the murder weapon three times before sending a shotgun blast into the child's skull. Even if, as claimed, defendant did not personally pull the trigger, his presence and assistance up to this point provided a basis from which jurors could have concluded that he actively acquiesced in this use of deadly force. Further corroboration comes from defendant's taped statement where he said that, by the time of the drive, he knew it was "too late with what we had done ... [and] I didn't want to go to jail." From this, jurors could have concluded that defendant fully intended the death of the victim, who knew and could identify both men.
*719 The jurors here could have reasonably rejected defendant's claim that he was dominated and controlled by his lover Copeland. Just as reasonably, they could also have rejected the contention that defendant played a subsidiary role and could have concluded, on the contrary, that he was an active participant and partner in all of the events of the evening, and thus that he fully intended the death of the victim at the hand of Copeland.
Defendant also contends that the state's evidence did not prove beyond a reasonable doubt that an aggravated rape or an aggravated kidnapping occurred.
La.Rev.Stat.Ann. 14:42(A)(4) (West 1986) provides that aggravated rape is a rape committed where the anal or vaginal intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of twelve years. At the time the crimes were committed, Owen was eleven years old.
The evidence at trial clearly proved defendant guilty as a principal to aggravated rape. According to his statement, defendant held the victim's arms while Copeland pulled down the boy's pants, slapped him across the face, and threatened to shoot him with a shotgun. Defendant then tied the victim's hands and, after the boy sucked both men's penises, watched Copeland rape him. The coroner's objective findings corroborated that account. On this evidence, any rational factfinder could have determined that defendant had actively participated in the offense.
We next consider whether the evidence supported a finding that the murder occurred during the commission of the aggravated rape. When Brooks and Copeland bound and gagged the victim and drove him to the remote spot, the killing was thus removed in time and place, somewhat, from the commission of the aggravated rape.
In State v. Shilling, 440 So.2d 110 (La. 1983), this Court found it reasonable to view the armed robbery as not being concluded until the victim was killed a short time after the armed robbery. Thus we affirmed defendant's conviction for first degree murder. Defendant and the other perpetrator had beaten, kicked, stabbed, and robbed the victim, leaving him for dead on the side of the road. They went to defendant's home to clean up. When they realized that defendant had lost his knife, they returned to the scene of the crime, where they found the victim, still alive, trying to hitchhike. They drove the victim to a more secluded spot, where they slit his throat and held him under water until he was dead.
In Shilling, the Court discussed two other decisions. In State v. West, 408 So.2d 1302 (La.1982) and State v. Anthony, 427 So.2d 1155 (La.1983), this Court considered whether an underlying felony had been completed before commission of a homicide.
In State v. West, the defendant was indicted for second degree murder. At that time second degree murder was defined in part as "The killing of a human being when the offender is engaged in the perpetration or attempted perpetration of ... armed robbery ... even though he had no intent to kill." The defendant in West argued that the homicide did not occur in the course of an armed robbery because the robbery occurred several blocks away from the scene of the killing and had been completed before the killing. In rejecting that argument we stated at 408 So.2d 1302 (sic; quote at 1305):
The armed robbery and the shooting which followed constituted essentially a single criminal incident. The offenders never left the victim; instead they escorted her from the scene of the armed robbery to the location where the shooting took place. Under these circumstances it is apparent that the killing occurred as part of the armed robbery.
In State v. Anthony, we analyzed the issue of whether a killing which took place after commission of a felony was committed in the perpetration of the felony. We observed that courts in other jurisdictions, in deciding the question, have held that the homicide is committed *720 during the course of the felony if it is within the "res gestae" of the underlying felony. In noting that the res gestae doctrine is principally an evidentiary tool which has never been used in Louisiana to define the parameters of the first degree murder statute, we stated at 427 So.2d 1158:
When "res gestae" has been used to determine whether the homicide was committed in the perpetration of a certain felony, it seems to have been a short way of saying that the underlying felony and the homicide form part of one continuous transaction which occurred without a significant break in the chain of events.
Applying the above reasoning, as well as the "continuous transaction" analysis of State v. West, we held that a homicide which occurred during the defendant's flight from the scene of an aggravated burglary could be found by the trier of fact to be first degree murder under La.R.S. 14:30(1), a homicide committed during the course of an aggravated burglary.
Shilling, 440 So.2d at 112-13.
In this case, although there was passage of a short time period and a change of locale from the commission of the aggravated rape until the killing, the perpetrators never separated from the victim. A rational factfinder could have found one continuous transaction from the rape to the killing.
The state's evidence of an aggravated kidnapping was more equivocal. Aggravated kidnapping is the forcible seizing and carrying of the victim from one place to another with the intent to force the victim or some other person to give up anything of value as a condition of release. La.Rev.Stat.Ann. 14:44(1) (West 1986). The state had no evidence that Copeland had forcibly seized the victim and brought him into the house. Although Copeland and Brooks bound the victim and drove him to the remote spot, there was no evidence that either Copeland or Brooks intended by that conduct to force the victim or some other person to give up anything of value as a condition of release. It is that intent to condition the victim's release upon his or any other person's giving up anything of value which distinguishes aggravated kidnapping from simple kidnapping. State v. English, 367 So.2d 815, 823 (La.1979). In this case, there may well have been insufficient proof that Brooks had the intent to condition Owen's release on anyone's giving up of anything of value.
However, as discussed above, we find the evidence sufficient to support a finding of an intentional killing committed during the commission of an aggravated rape.
Defendant's contention in Assignment of Error No. 3 that there was insufficient evidence to support all of the necessary elements of first degree murder is therefore without merit.

Assignment of Error No. 10
Defendant contends his confession was "seized" unconstitutionally and should have been suppressed.
Defendant argues that he was escorted from his home by police involuntarily. Specifically, defendant complains of not being advised that he could refuse to accompany officers, that he was a suspect in a murder investigation, or that he was under arrest. He contends these circumstances rendered his detention and custodial interrogation unlawful. He argues that since the state did not establish his later confession was sufficiently attenuated from the initial illegality, it should have been suppressed.
Before a statement can be admitted into evidence, the state must prove that it was freely and voluntarily made. La. R.S. 15:451; State v. Campuzano, 404 So.2d 1217 (La.1981); State v. Petterway, 403 So.2d 1157 (La.1981); State v. Haynie, 395 So.2d 669 (La.1981); State v. Castillo, 389 So.2d 1307 (La.1980). If the statement was made during custodial interrogation, the state must also show that the defendant was advised of his Miranda rights before making the statement. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, supra; State v. Sonnier, 379 So.2d 1336 (La.1979). Finally, *721 if the defendant alleges police misconduct in reference to the statement, it is incumbent upon the state to rebut these allegations specifically. State v. Dison, 396 So.2d 1254 (La.1981); State v. Franklin, 381 So.2d 826 (La.1980).
State v. West, 408 So.2d 1302, 1307 (La. 1982).
The admissibility of a confession is in the first instance a question for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the statement will not be overturned unless they are not supported by the evidence. State v. Manning, 380 So.2d 46 (La.1980).
State v. Jackson, 414 So.2d 310, 312 (La. 1982).
The testimony at the hearing on the motion to suppress related the following events: East Baton Rouge Sheriff Department Deputy Angela Diez was canvassing the victim's neighborhood on Sunday, July 8, 1979. Around 5:30 p.m., she was at defendant's home, asking the same series of questions posed to other area residents. When defendant replied that he had seen the child, officers "asked him to accompany [them] to the Kleinpeter Substation" for further questioning. Meanwhile, Copeland was still being questioned at the substation. About 8:00 p.m. Copeland gave a statement, implicating defendant in the crimes.
The next evening, Livingston Parish Detectives William E. Robertson and Dillard Stewart interrogated defendant in the Livingston Parish jail. Defendant signed the standard advisement of rights form, which had the following information penned in at the top: "We want to question you about any knowledge you have in the murder of Joseph Cook Owen...." After being advised of his rights, defendant executed a written waiver and gave a verbal statement admitting his part in the rape, abduction and murder of Joseph Cook Owen. The statement was recorded, and a secretary was called in to transcribe it. When the secretary completed the transcript, defendant read and initialed each page, signing the last one about 10:30 p.m. on Monday, July 9, 1979.
On this record, it cannot be said that any impropriety or illegality occurred. Defendant did not establish what officers said or did not say to him on Sunday at his home, nor did he develop any evidence as to police misconduct occurring after he arrived at the Kleinpeter substation in Baton Rouge. No hint or suggestion of coerciveness or overreaching is found in this record. On the contrary, at neither the second suppression hearing nor the second trial did defendant challenge the voluntariness of his trip to the substation or the voluntariness of his statements. Instead, defendant acknowledged from the witness stand that the taped confession was his own and that it was true.[6] Defendant did not contend, nor would this record support, that any of his substantial rights were denied or violated.
Under these circumstances, there is no support in this record for defendant's contentions, contained in brief, that his trip to the substation was anything less than voluntary or that his confession should have been suppressed because it was tainted by an unlawful detention.
However, defendant had also moved to suppress his confession in his first trial,[7] claiming that his statement had been made in violation of his Miranda rights. The transcript of the evidentiary hearing and court ruling on the motion to suppress are available for our review. We choose to review that transcript in this capital case even though under ordinary principles of appellate review we might not be compelled *722 to do so. We note also that at the second trial, defendant's counsel did not argue, as defendant's counsel had argued at the first trial, that defendant's statement had been made involuntarily. If this argument were meritorious, the failure to present that argument in the second trial might support a contention regarding ineffective assistance of counsel. For these reasons, we shall examine the transcript of the evidentiary hearing held before the first trial on defendant's motion to suppress.
That hearing contains a more detailed account of defendant's interrogation. The police officers testified that when Copeland finished making his statement to the police on Sunday evening, the officer who had questioned Copeland gave defendant his Miranda rights and informed him that he was under arrest for kidnapping, crime against nature, rape, and as a fugitive from Livingston Parish on a charge of first degree murder. Brooks refused to sign the rights waiver or to make a statement at that time. He was taken to the Baton Rouge parish jail, formally booked, and placed in a cell.
At 3:30 on Monday morning, defendant was brought from his cell, given his Miranda rights, and questioned again. He signed the waiver form and denied any involvement in the crime. He also broke down and professed his deep love for Copeland.
At the hearing on the motion to suppress before his first trial, Brooks testified that at the Baton Rouge jail he was stripped naked, thrown into an iron cell by himself, handcuffed and shackled to a wooden bench with leg irons. He testified that the only toilet accommodation in the cell was a hole in the floor. He claimed that he signed the rights waiver at the 3:30 a.m. interview because "after being in jail all night freezing to death in a cold cell [he] would have signed anything to try to get out." However, at that interview, he did not admit any complicity in the crimes.
The officers testified that defendant was again given his Miranda rights and questioned about the murder at 8:42 a.m. on Monday. Although he signed the rights waiver, Brooks made no statement. Later during the day, defendant was taken from the East Baton Rouge Parish jail to the Livingston Parish jail. At 6:45 p.m. on Monday, he was again given his Miranda rights and questioned about the murder. It was at this interview that Brooks made the inculpatory statement which is the subject of the motion to suppress.
When a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the "scrupulous honoring" of that right by the police. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). A majority of this court has concluded that the question of whether an accused's rights are "scrupulously honored" depends on the totality of the circumstances involved under the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include "the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right ... and the subsequent interrogation." State v. Harper, 430 So.2d 627, 633 (La.1983).
In State v. Woods, 435 So.2d 1137 (La. App. 1st Cir.1983), defendant argued that his inculpatory statement was obtained in violation of his Miranda rights. Defendant had been read his rights and questioned about an unrelated incident, at which time he refused to sign the waiver of rights form. Approximately one hour later, another officer, who stated that he was not aware that defendant had previously refused to sign the waiver form, questioned defendant about the purse snatching of which defendant was subsequently convicted. Defendant argued that the interval between his refusal and the officers' questioning him about the purse snatching was so brief as to violate his constitutional rights under Miranda. The supreme court held that the statement was freely and *723 voluntarily made. It found it reasonable that defendant may have chosen to invoke his right to silence concerning the unrelated incident but not the purse snatching. Id. at 1140.
In Manning, 380 So.2d 46, defendant argued that his statement had been obtained in violation of his right to remain silent and his right to counsel. He contended that the police conduct encouraged defendant to believe that he could not go home unless he gave a statement. At 1:41 a.m., in response to a complaint, the police gave defendant his Miranda warnings and took him to the police station. At 2:25 a.m., defendant signed a waiver of his rights. At 4:59 a.m., defendant requested an attorney. The officer told defendant that there was not an attorney available then and the questioning would have to be at a later time. As the officers were leaving the room, defendant said that he did not need an attorney and he wanted to "clear the air." He then admitted being at the scene of the crime, but he denied committing the crime. The supreme court held that defendant's Miranda rights were not violated. It recited the following facts: defendant received three Miranda warnings before making his exculpatory statement; the officers immediately stopped their questioning when the defendant said he wanted an attorney; the statement was volunteered by defendant, not made in response to police questioning. Id. at 50-51.
In the case at bar, Brooks testified that he would have said anything at the 3:30 a.m. interview because he had been "freezing to death in a cold cell." However, the statement given under that "duress" was essentially exculpatory; at that interview, defendant denied any complicity in the crimes. Defendant does not allege any beating or physical abuse by the police at that time, nor does he allege any further duress other than being kept naked in a cell on Sunday night. The inculpatory statement was not made until 6:45 p.m. on Monday, some fifteen hours later, in a different location and after Miranda warnings had been given again. That statement was not induced by the events at 3:30 a.m. Read in its entirety, the record, including the transcripts of both evidentiary hearings, does not support defendant's contention that his confession was "seized" unconstitutionally. This assignment does not have merit.

Assignment of Error No. 9
Defendant claims his lead attorney rendered ineffective assistance of counsel. He claims counsel was ill-prepared for trial and failed to appear for sentencing or to render assistance in post-conviction matters. Defendant offers no detail, argument or law in support of his contentions that such circumstances, even if true, mandate reversal of his conviction and sentence.
A review of the record indicates that appropriate pre-trial pleadings were filed and hearings conducted. At trial, and as claimed, defense counsel asked no questions of state witnesses. The record also indicates that lead counsel was not present when defendant was sentenced to death. Assignments of Error were filed over the signature of assistant trial counsel and another attorney. The record also contains a Motion to Withdraw filed on behalf of the lead attorney by such attorney's brother on the grounds of illness.
There is nothing of record to indicate the onset, nature or extent of the illness. Nor is there anything of record to substantiate defendant's other allegations, or how the alleged events played any part in counsel's representation or trial performance.
Because support for defendant's allegations is not evident in this record, we do not find these arguments meritorious. That is not to say that defendant might not be able to argue and prove ineffective assistance of counsel with evidence which is not part of the record at this time. The right of a defendant in a criminal proceeding to the effective assistance of counsel is constitutionally mandated. U.S. Const.Amend. VI; La. Const. art. 1, § 13; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Clark, 492 So.2d 862, 871-72 (La.1986); State v. Berry, 430 So.2d 1005 (La.1983); State v. *724 Felde, 422 So.2d 370 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); State v. Myles, 389 So.2d 12 (La.1980) (on rehearing). Defendant has the right to apply for post-conviction relief on the basis of ineffective assistance of counsel.[8] Defendant would not be confined to this record in his application for post-conviction relief.
The only argument that we can examine on the basis of this record is defendant's claim that counsel's "no question defense" constituted ineffective assistance of counsel.
The standard of competence required of defense counsel in a criminal case is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable....
Id. at 687, 104 S.Ct. at 2064.
The record indicates that the decision to employ a "no question defense" was a deliberate one. It appears to be more a product of trial strategy than the result of poor preparation or incompetent representation. The strategy was no doubt designed to rob the state of the force of its evidence. By conceding defendant's presence throughout, defense counsel could focus juror attention on the few facts that weighed in defendant's favor, i.e. that the state could not, through its physical evidence, place defendant's hand on the trigger or show conclusively that he also raped the victim. In this way, counsel sought to distance his client from the aggravated rape as well as the actual killing and thus influence the jurors toward leniency in the selection of the punishment.
While opinions may differ on the advisability of such a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful. Strickland v. Washington, 466 U.S. 668. In this case, we do not find that counsel's "no question defense," although unsuccessful, constituted ineffective assistance of counsel.
At least on the arguments advanced by the defense in brief, this assignment is without merit.

Assignment of Error No. 6 and Supplemental Assignment of Error No. 11
Defendant contends he was denied a speedy trial.[9]
On January 12, 1984, defendant was granted a new trial.[10] The state had *725 one year under La.Code Crim.Proc.Ann. art. 582[11] to begin the second trial. Defendant's trial was not begun until October 7, 1985. When a defendant obtains a new trial and does nothing to suspend or interrupt the time limitation, if the state fails to commence trial within one year, a motion to quash for untimeliness should be sustained and the prosecution discharged. La.Code Crim.Proc.Ann. art. 582; State v. Brown, 451 So.2d 1074, 1078-80 (La.1984); State v. Taylor, 439 So.2d 410 (La.1983). However, in this case, defendant took steps which relieved the state of the necessity of commencing trial by January 12, 1985. Defendant's counsel filed an application for discovery and a motion to suppress defendant's confession on January 9, 1985. In order to allow the state a reasonable time in which to reset the case for trial after the court has ruled on any preliminary pleas, La.Code Crim.Proc.Ann. art. 580 gives the state an additional year in which to retry the defendant. La.Code Crim.Proc.Ann. art. 580 (West 1981); id. comment; State v. Falkins, 395 So.2d 740 (La.1981) (article 580, governing suspension of article 578's time limits also applies to the one year limit for retrial under article 582). Consequently, defendant's actions suspended the running of the time limitation until May 5, 1985, when the trial court ruled on the matters. Therefore, the state had until May 5, 1986, to bring the defendant to trial. Defendant's trial on October 7, 1985, was timely, and the motion to quash was properly denied.

These assignments are without merit. Sentence Review
A capital sentence requires this Court to review every sentence of death to decide whether the sentence is excessive. For reasons discussed at more length in an unpublished appendix,[12] we have concluded that (1) the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, (2) the evidence supports the jury's finding of at least one statutory aggravating circumstance, and (3) the sentence is not disproportionate to the sentence imposed in similar cases, considering both the crime and the defendant. Supreme Court Rule XXVIII.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari, or
(d) that court denies his application for rehearing.
CONVICTION AND SENTENCE AFFIRMED.
LEMMON, J., concurs.
NOTES
[1] The jury in defendant's first trial found him guilty of first degree murder and recommended the death sentence. This Court remanded to the district court for a hearing on defendant's motion for a new trial based on newly discovered evidence. 407 So.2d 718 (La.1981). On remand, the district judge granted defendant a new trial. The second trial is the subject of this appeal to this Court, pursuant to La. Const. art. V, § 5(D)(2).
[2] U.S. Const.Amend. V.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Defendant assigns eleven errors to the proceedings below. Five assignments of error are discussed at length in this opinion. The other six were not fully briefed. They do not represent reversible error nor do they involve legal issues not governed by clearly established principles of law. They will be treated in an appendix which will not be published but which will comprise part of the record in this case. In addition, part of the capital sentence review, which includes no new issues of law, will also be discussed in the unpublished appendix.
[5] La.Rev.Stat.Ann. 14:30 (West 1986) provides in part as follows:

A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;
* * * * * *
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years.
[6] However, defendant's testimony at trial that the confession was his own and that it was true does not preclude his raising the issue of admissibility of the confession. In Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the United States Supreme Court held that when an accused takes the stand in order to overcome the impact of an illegally obtained, and therefore improperly introduced, confession, then his testimony is tainted by the same illegality that rendered the confession inadmissible.
[7] See supra note 1.
[8] La.Code Crim.Proc.Ann. art. 930.3(1) (West 1984) provides as follows: "If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted ... on the ... grounds [t]he conviction was obtained in violation of the constitution of the United States or the state of Louisiana...."
[9] Although Assignment of Error No. 6 stated a contention that the sentence was unlawful, in it defendant complained only about the inordinate delay in commencing retrial. Although merely stated rather than argued, nevertheless, defendant articulates a claim that the delay denied his right to a speedy trial. Supplemental Assignment of Error No. 11 contends that his second trial was untimely and his motion to quash should have been granted.
[10] Following his first trial defendant's appeal was docketed here. The following month, defendant's appeal counsel filed a motion for a new trial alleging gross judicial impropriety. The motion alleged that the trial judge, among other things, met and dined with jurors, allowed some to run personal errands, and, on one occasion, had his hair cut and dressed by a juror in the juror's hotel room. Accordingly, this court remanded for a hearing to determine defendant's entitlement to retrial. State v. Brooks, 407 So.2d 718 (La.1981). In fact, however, a hearing was never conducted. Instead, twenty-five months later, the judge simply signed an order, granting defendant a new trial.

Presumably, Brooks was granted a new trial because of this Court's action in Copeland's appeal. Copeland's first trial was also presided over by the same judge. On appeal of his death sentence this Court overturned the conviction and sentence for impropriety involving deputy-bailiff gifts to jurors, as well as judge-juror colloquies outside the presence of defendant. State v. Copeland, 419 So.2d 899, 904-905 (La. 1982).
[11] La.Code Crim.Proc.Ann. art. 582 (West 1981) provides as follows: "When a defendant obtains a new trial or there is a mistrial, the state must commence the second trial within one year from the date the new trial is granted, or the mistrial is ordered, or within the period established by Article 578, whichever is longer."
[12] The sentence review does not find any reversible error or discuss any legal issues not governed by clearly established principles of law. The appendix will not be published but will comprise part of the record in this case.