NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-513


STATE OF LOUISIANA

VERSUS

KENNETH WAYNE BELL


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 276875
HONORABLE JOHN C. DAVIDSON, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED.**


**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**Counsel for Defendant/Appellant:**
    **Kenneth Wayne Bell**

**Hon. James C. Downs**
**District Attorney - 9th JDC**
**701 Murray Street**
**Alexandria, LA 71301**
**Counsel for State/Appellee:**
**State of Louisiana**

**Loren Marc Lampert**
**Walker, Passman & Michiels**
**3800 Parliament Drive**
**Alexandria, LA 71315**
**Counsel for State/Appellee:**
**State of Louisiana**

**Kenneth Wayne Bell**
**Louisiana State Penitentiary**
**Camp J - Bass Unit**
**Angola, LA 70712**
**Pro Se**

**Pickett, Judge.**

**FACTS**

The defendant was convicted as a principal to second degree murder for the killing of Christopher Cook and as a principal to the attempted second degree murder of Jose Reyna, Jr. These events occurred at Cook's apartment in Alexandria, Louisiana, on April 23, 2003, during a drug transaction.

On February 24, 2005, the defendant, Kenneth Wayne Bell, was charged in an indictment with one count of second degree murder, a violation of La.R.S. 14:30.1, and one count of attempted second degree murder, a violation of La.R.S. 14:30.1 and La.R.S. 14:27. The defendant entered a plea of not guilty on March 11, 2005. Jury selection in the matter began on July 12, 2005. The jury returned a verdict of guilty as to each count on July 15, 2005.

A Motion for New Trial and a Motion for Judgment of Acquittal were filed on September 1, 2005. The motions were denied on December 5, 2005, and the defendant was sentenced to life, without benefit of probation, parole, or suspension of sentence for second degree murder and to fifty years at hard labor without benefit of probation, parole, or suspension of sentence for attempted second degree murder. The court ordered the sentences to be served concurrently. An oral motion to reconsider sentence was made and denied.

A Motion for Appeal and Designation of Record was filed on December 16, 2005. The defendant is now before this court asserting two assignments of error. Therein, the defendant contends the evidence was insufficient to support his convictions, and the trial court erred in allowing inadmissible hearsay evidence to be presented to the jury.

1

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## DISCUSSION

In his second assignment of error, the defendant contends the evidence was insufficient to sustain the verdict. Since a ruling that the evidence was insufficient would necessitate an acquittal, we will address this assignment first, pursuant to *State v. Hearold*, 603 So.2d 731 (La.1992).

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676, 678 (La.1984). That standard dictates that to affirm the conviction the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all elements of the crime beyond a reasonable doubt. *State v. Johnson*, 03-1228, p. 4 (La.4/14/04), 870 So.2d 995, 998; *Captville*, 448 So.2d at 678. Further, when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." However, La.R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. *State v. Toups*, 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; *State v. Chism*, 436 So.2d 464, 470 (La.1983).

> When evaluating circumstantial evidence, the trier of fact must consider the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and

2

weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*Chism*, 436 So.2d at 469.

Finally, constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305, 1309 (La.1988). Rather, the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law. *Johnson*, 870 So.2d at 998; *Toups*, 833 So.2d at 912.

*State v. Spears*, 05-964, pp. 1-3 (La. 4/4/06), 929 So.2d 1219, 1222-23.

The indictment charging the defendant indicates he was charged with second degree murder, in that he did kill Christopher Cook "with specific intent to kill or inflict great bodily harm; and while engaged in the commission of the offense of armed robbery" of Christopher Cook and Jose Reyna. Additionally, the defendant was charged with attempted second degree murder, in that he did attempt to commit second degree murder of Jose Reyna "with specific intent to kill and while engaged in the commission of the offense of armed robbery" of Christopher Cook and Jose Reyna.

The defendant was convicted of second degree murder and attempted second degree murder. Louisiana Revised Statute 14:30.1 defines second degree murder, in part, as follows:

A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first

3

degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

Attempt is defined, in part, in La.R.S. 14:27 as follows:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

In order to convict a defendant as a principal to specific-intent second degree murder, the state must prove the defendant had specific intent to kill or to inflict great bodily harm. *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Under the state's alternate theory that [the defendant] shot the victim during an armed robbery, the state had to prove the defendant had the intent to commit, or directly aid in the commission of, an armed robbery, and a killing resulted. La.R.S. 14:30.1(A)(2)(a) and La.R.S. 14:24.

*State v. Cooper*, 03-161, p. 4 (La.App. 3 Cir. 12/23/03), 862 So.2d 512, 516, *writ denied*, 04-236 (La. 6/4/04), 876 So.2d 74.

To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Huizar*, 414 So.2d 741 (La.1982).

4

*State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437.

> An individual may be convicted only for those crimes for which he personally has the requisite intent. It is not enough that his accomplice have the intent, the State must prove that the defendant had the required mental element. [*State v.*] *Brooks*, 505 So.2d [714,] 717 [(La.1987)]; [*State v.*] *Holmes*, 388 So.2d [722,] 726 [(La.1980)].
>
> Specific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused. *Brooks*, 505 So.2d at 717. To establish specific intent the state must show that the defendant pulled the trigger, that he acted in concert with his co-perpetrator, or that he actively acquiesced in the use of deadly force. [*State v.*] *Anthony*, [98-406,] pp. 12-14 [(La. 4/11/00),] 776 So.2d [376,] 386; *Brooks*, 505 So.2d at 718.

*State v. Tate*, 01-1658, pp. 7-8 (La. 5/20/03), 851 So.2d 921, 930, *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604 (2004).

Jose Reyna Jr. and Christopher Cook met at a halfway house in Rapides Parish. Reyna returned to Texas after leaving the halfway house. However, two to three months later, Reyna made three deliveries of marijuana to Cook. Cook would sell the marijuana then pay Reyna for the initial delivery. On April 23, 2003, Reyna went to Alexandria to pick up a truck and a portion of the money Cook owed him for the last delivery. Reyna testified that, when he arrived at Cook's apartment, there were two men in the apartment. Cook was conducting a drug transaction with the two men, and Cook left the room and returned with an ice chest containing four pounds of marijuana. During the transaction, Reyna and Cook were seated on a sofa on the left side of the room and the other two men on a sofa on the right side of the room. Reyna testified that the big man weighed the marijuana, and the other man, Paul Roberts, pulled out a gun. Roberts then said, "don't, don't move, don't say nothin', you know, we just gonna take this," referring to the marijuana. Reyna later testified that Roberts said, "just be cool, don't say nuthin', don't do nuthin', we gonna take this . . ." Reyna

5

further testified that the big man was standing by the door with the marijuana in his hands and said, "no man, blast 'em, blast 'em." Roberts then shot Cook and Reyna as he was walking or running out of the apartment. Reyna was taken to Cabrini Hospital, where he remained hospitalized for two weeks. Cook died as a result of a gunshot wound to the neck and was pronounced dead at the scene. An autopsy revealed that a bullet entered Cook's left neck, lacerated the left jugular vein and the top portion of the left lung, and exited out his back.

While still at the scene, Reyna gave Deputy Billy Brewer a description of his assailants. He described them as two black males, one having long hair and tattoos and the other as heavyset with short hair. Reyna also gave a statement to police while he was at the hospital. Detective Cedric Green testified that Reyna described his assailants as a tall, light skinned, black male, and a dark skinned, heavyset, black male. Reyna described the heavyset black male as approximately six feet tall, weighing between three hundred and three hundred and fifty pounds, and wearing a big gold chain. Reyna testified that in that statement, he told police he was at Cook's apartment to buy a truck and did not inform them that he had been delivering marijuana to Cook. However, Reyna later admitted his involvement with drugs.

Detective Green obtained information that Paul Roberts may have been involved in the shootings, so he put together a lineup containing a photograph of Roberts and presented it to Reyna. Reyna identified Roberts as the shooter. Approximately a week or two after the shootings, Detective Green received an anonymous tip that the defendant was the person with Roberts when the shootings occurred. Detective Green then prepared a lineup containing a photograph of the

defendant. Reyna did not identify the defendant. However, Detective Green testified the defendant matched the description given by Reyna.

Reyna testified that he was never able to identify the defendant from a photographic lineup. Reyna further testified that he did not recall being shown the lineup containing the defendant's picture that was admitted into evidence as State Exhibit 9. However, at trial, Reyna identified the defendant as the person who gave the orders to shoot. Reyna further testified that, in June or July of the year prior to trial, he saw the defendant leaving a courtroom and "recognized 'im off bat."

Detective Green testified that the defendant heard police were looking for him and, as a result, went to the Alexandria Police Department. While there, the defendant admitted he was in Cook's apartment when the shootings occurred. In his statement to Detective Green, the defendant indicated he and Cook saw each other in a store parking lot, and Cook told the defendant he had marijuana. Subsequently, the defendant went to Cook's apartment. P.J., who was high on Xanax, then arrived. Cook let P.J. in and P.J. sat on the sofa next to the defendant. Cook then came back with a cooler which contained marijuana. Cook subsequently sold the defendant a pound of marijuana. As the defendant was about to walk out the door, he heard a gun click. The defendant indicated he turned around and saw P.J. holding a gun toward Cook and Reyna. The defendant then told Detective Green that he begged P.J. not to "do this, you'll mess up your life by doing this here, don't do this, you know." The defendant indicated that when P.J. started shooting he left and got in his car alone and drove off. Detective Green testified that the Defendant wore a large gold chain at the time he gave his statement.

7

Detective Stephen Constantino went to Cook's apartment on the night of the shootings. Detective Constantino testified that police found a pair of scales and a brown satchel containing seven thousand eight hundred dollars under the sofa closest to Cook's body. A small ice chest containing four ounces of marijuana was found in the corner of the living room. Additionally, Officers Billy Brewer and Gary Cloud found a large ice chest containing bags of marijuana in the bath tub.

Sergeant William Bates testified that five spent cartridge casings were found inside the apartment, and the crime lab determined that all the casings were fired from one weapon. Additionally, a bullet found by Detective Constantino on the left rear floorboard of Robert's car had been cycled or chambered through the same weapon that fired the cartridge casings found in Cook's apartment.

Sergeant Bates and Detective Constantino testified that no prints matching those of the victims or assailants were found on evidence collected in Cook's apartment. Additionally, no fingerprints were found on the door of the apartment or the glass table top located in the living room.

The defendant contends that, without testimony by Detective Green that he had information that two girls standing at the end of the stairs observed the defendant and Roberts enter Cook's apartment together, the evidence is insufficient to support the jury's verdict. The defendant additionally contends that in order to convict him of attempted second degree murder the state was required to prove he had the specific intent to kill Reyna, as attempted second degree murder cannot be based upon the underlying felony of armed robbery. In support of this argument, the defendant cites *State v. Graham*, 02-1492 (La.App. 1 Cir. 2/14/03), 845 So.2d 416. The defendant contends that, to support the conviction for attempted second degree murder, the State

8

was required to prove that he was the shooter or, under the law of principals, that he or Roberts planned to utilize deadly force during the commission of a robbery. The defendant further contends the State produced no evidence that he entered Cook's apartment with the intent to rob Cook or that he conspired with Roberts to rob Cook.

The State contends the court need look no further than the testimony of Reyna who stated that Roberts did not shoot until the defendant said "blast 'em" in order to support the defendant's convictions. This assertion is correct.

The defendant notes, in brief, that in his first statement to police Reyna did not mention that the defendant said "blast 'em." Detective Green testified that Reyna did not say the defendant made any remarks at the time of the shooting. However, Detective Green was later questioned and testified as follows:

> Q. From the very beginning he told you, ah, he wasn't truthful, albeit, about, ah, why he was in town, but from the very beginning he insisted that the big guy ordered the skinny guy to shoot.
>
> A. Correct, he did.
>
> Q. And, and you mentioned that it wasn't in the first statement that you took, but did you prepare kind of a chronological report of your investigation here, I mean, it's common for you to do that.
>
> A. Right.
>
> Q. And, I think you testified that when you went the first night, they were prepping 'im for surgery, he'd been shot three or four times . . . although it didn't appear in his taped statement, does your report reflect that on that first interview he insisted that the large guy had ordered the skinny guy to shot 'im.
>
> A. Yes sir, he did.
>
> . . . .
>
> Q. Ahm, but he'd always told you the big guy ordered the skinny guy to shoot.
>
> A. From day one.

9

Reyna testified several times that he had no doubt the big man made the remarks at issue.

In *State v. Tobias*, 452 So.2d 157 (La.1984), the defendant was found guilty of second degree murder. Testimony indicated the defendants argued with the victim and taunted him with a wine bottle. Simmons eventually pulled out a pistol, waived it in the victim's face, and taunted the victim. Tobias then stated, "Keep on talking, you're going to die, b_ _ _ h." *Id*. at 159. Thereafter, Simmons fired the pistol at the victim. When upholding the defendant's conviction, the court stated the following:

> Tobias' actions certainly expressed animosity toward the victim. Whether they evidenced a specific intent to kill Henry is a more difficult question. On one hand, Tobias, while wanting to scare Henry, may have had no intention to kill him. On the other hand, Tobias and Simmons may have planned to kill Henry when they approached--Tobias' statement before the murder supports such intent. We conclude that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the state proved Tobias' intent to kill the victim beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and hold that the evidence was sufficient to support the verdict of second degree murder.

*Id*.

The evidence proved the defendant told Roberts, after Roberts pulled out a gun, to "blast 'em," and Roberts then shot Cook and Reyna. This testimony is sufficient to support the requisite intent required to convict the defendant as a principal to second degree murder and attempted second degree murder. Therefore, we find the State proved the elements of both offenses beyond a reasonable doubt, thus supporting the jury's verdicts.

As the evidence proved the defendant had the specific intent to kill Cook and Reyna, we need not address Detective Green's testimony, whether the state was required to present evidence that the defendant and Roberts conspired or discussed

10

the killing of Cook and Reyna or robbery prior to entering Cook's apartment, and whether an attempted second degree murder conviction can be based on an underlying felony such as armed robbery.

As the evidence proved the defendant had the specific intent to kill Cook and Reyna, and the defendant actively acquiesced in the use of deadly force, this assignment of error lacks merit.

In his first assignment of error, the defendant contends the trial court committed reversible error in allowing inadmissible hearsay evidence to be presented to the jury. In the alternative, the defendant argues that defense counsel was ineffective in failing to object to the testimony.

Detective Cedric Green testified that he had information that two girls standing at the stairs saw the defendant and Roberts going into Cook's apartment together, but the girls' grandmother would not let Detective Green speak to them. Defense counsel did not object to this testimony nor did he object during closing arguments when the State indicated two little girls saw the defendant and Roberts pull up and walk up together.

The defendant contends the testimony by Detective Green was hearsay and inadmissible testimony. The defendant further contends that defense counsel was ineffective, as he failed to object to Detective Green's testimony and the State's closing argument. The defendant contends he was prejudiced by the actions of counsel, in that he would not have been convicted without the testimony and remarks at issue.

11

In *State v. Chesson*, 03-606 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686, the court discussed the erroneous admission of hearsay evidence as follows:

> [E]ven the erroneous admission of irrelevant evidence does not require a reversal of a conviction if the error is harmless beyond a reasonable doubt. *See State v. Wille*, 559 So.2d 1321 (La.1990), *cert. denied*, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992), *citing Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993), the United States Supreme Court explained that:
>
> > Harmless-error review looks . . . to the basis on which "the jury actually rested its verdict." *Yates v. Evatt*, 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)(emphasis added). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

*Id*. at 179-80.

Whether the defendant and Robert went to the apartment together does not tend to prove the defendant's guilt, as there was no evidence of any conversation or plan between the two prior to their arrival at the apartment. Therefore, any testimony that the two went to the apartment together was surely unattributable to the verdicts in this matter, as comments made by the defendant just prior to the time Roberts shot Cook and Reyna proved the defendant had the specific intent to kill them. Accordingly, even if the testimony and closing remarks at issue were inadmissible, which we do not determine to be the case, the admission of the testimony and closing remarks would amount to harmless error, as they lacked relevance to the State's case and the defendant has failed to establish that he was prejudiced by same.

12

The verdicts in this matter were surely unattributable to the testimony and comments complained of by the defendant. Accordingly, this assignment of error lacks merit.

## CONCLUSION

_____The defendant's convictions are affirmed.

**AFFIRMED.**