# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-161

**STATE OF LOUISIANA**

**VERSUS**

**SCOTT ALLEN COOPER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 88706A
HONORABLE J. DONALD AARON, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Glenn B. Gremillion, and Elizabeth A. Pickett, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**Thibodeaux, J., dissents and assigns written reasons.**

**Michael Harson**
**District Attorney, 15th JDC**
**J. Floyd Johnson, ADA**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**Counsel for State-Appellee:**
  **State of Louisiana**

**James L. Brazee, Jr.**
**Lee Andrew Gallaspy**
**Brazee, Cormier & Gallaspy**
**2901 Johnston St., #206**
**Lafayette, LA 70503**
**(337) 237-0492**
**Counsel for Defendant-Appellant:**
  **Scott Allen Cooper**

**PICKETT, Judge.**

### FACTS

On December 7, 1997, at approximately 4:00 p.m. the defendant and a friend, Vince Moore, approached the vehicle of the victim, Earl Zenon, in a parking lot in Lafayette, Louisiana. According to an eyewitness, Moore went to the driver's side and the defendant went to the passenger's side of the car. The eyewitness testified that Moore conversed briefly with the victim, then produced a pistol and shot the victim five times. Moore then jumped into the driver's seat of the victim's car, apparently pushing the victim over, while the defendant jumped into the back seat of the victim's car. Moore and the defendant left the shopping center in the victim's car. The eyewitness followed them, calling the police with his cell-phone. The authorities advised the witness not to follow and he desisted. The car and the body of the victim were later found in a remote area of Evangeline Parish. The car had been set on fire with the victim in it.

On November 15, 2000, a Lafayette Parish grand jury indicted the defendant, Scott Cooper, for being a principal to the first degree murder of Earl Zenon in violation of La.R.S. 14:24 and 14:30. The state subsequently amended the charge to principal to second degree murder, in violation of La.R.S. 14:24 and 14:30.1. This matter was tried before a jury who returned a unanimous verdict of guilty as charged.

The defendant subsequently filed motions for post verdict judgment of acquittal and for a new trial on November 7, 2002. Those motions were heard by the trial court and denied. The defendant was sentenced to the mandatory term of life without benefit of parole, probation, or suspension of sentence. The defendant appeals his conviction.

### ASSIGNMENTS OF ERROR

On appeal, the defendant alleges five assignments of error:

1. The jury erred by finding the State had proven beyond a reasonable doubt all of the essential elements of Principal to Second Degree Murder.

2. The Trial Court erred in denying the Defendant's Motion for Post Verdict Judgment of Acquittal and/or Alternatively For a New Trial.

3. The Trial Court erred by not granting the defendant's motion for mistrial; the State, having failed to sustain the burden of proof beyond a reasonable doubt, instead relied on prosecutor's personal perspective, aggressive advocacy, jury theatrics and use of prejudicial autopsy photographs to present a case based on hypothetical speculation. The prosecutor's systematic statements as to his theories, which were not supported by the evidence, violated the defendant's constitutional rights of due process and for a fair trial, guaranteed under the United States Fifth Amendment and Fourteenth Amendment and Article I, §§ 2 and 16 of the Louisiana Constitution of 1974.

4. The Trial Judge erred by permitting a State's witness, Herbert Zenon, to testify after witness Zenon violated the rule of sequestration.

5. The Trial Judge erred by not replacing Juror #150, Joseph Floyd Zeno, when presented with evidence of the appearance of impropriety and bias on the part of Juror Zeno.

## DISCUSSION

The first two assignments of error are related and will be discussed together. The defendant argues the evidence adduced against him at trial was insufficient to support his conviction. The test for insufficiency claims is well-settled and is thoroughly discussed in *State v. Kennerson*, 96-1528, p.5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of

2

fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Second degree murder is proscribed by La.R.S. 14:30.1, which states in pertinent part:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
> (2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . even though he has no intent to kill or to inflict great bodily harm.

These are the provisions of the statute the court read to the jury, at both the opening and the closing of trial, and argued by the state.

At trial, the state argued the killing was either a specific-intent murder or a felony-murder, or both. Armed robbery is defined by La.R.S. 14:64(A):

> Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

Also, the state charged that the defendant acted as a principal to the murder. The law of principals is governed by La.R.S. 14:24:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

The court instructed the jury it could find the defendant guilty of the lesser-included offense of principal to manslaughter, based upon the underlying offense of carjacking. The relevant portion of the manslaughter statute, La.R.S. 14:31, states:

3

A.  Manslaughter is:

. . . .

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; . . .

Carjacking is defined by La.R.S. 14:64.2(A):

A.  Carjacking is the intentional taking of a motor vehicle, as defined in R.S. 32.1(40), belonging to another person, in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, by the use of force or intimidation.

In order to convict a defendant as a principal to specific-intent second degree murder, the state must prove the defendant had specific intent to kill or to inflict great bodily harm. *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337 (1987).  Under the state's alternate theory that Moore shot the victim during an armed robbery, the state had to prove the defendant had the intent to commit, or directly aid in the commission of, an armed robbery, and a killing resulted. La.R.S. 14:30.1(A)(2)(a) and La.R.S. 14:24.  It is well settled that intent may be inferred from a defendant's actions.  *State v. Recard*, 97-754 (La.App. 3 Cir. 11/26/97),  704 So.2d 324.

The State's first witness was Bill Ortego, an Evangeline Parish deputy at the time of the offense, who responded to a report by a landowner that something was on fire on the landowner's property.  Deputy Ortego found the victim's burning car in a remote area of Evangeline Parish with the victim's body in the car.  Deputy Ortego described the location of the vehicle, the condition of the vehicle, and the condition of the body.

4

Detective John Demourelle of the Evangeline Parish Sheriff's Office also testified regarding the location and condition of the victim's car and body. He testified regarding the recovery of the vehicle identification number (VIN), his contacts with Lafayette Parish law enforcement, his contact with the victim's family, and the initial identification of the body as being that of Earl Zenon. He further testified as to the extreme remoteness of the area where the burning car was discovered and his development of information that a man named Danny Smith was familiar with this remote area.

Sergeant Kelly Gibson of the Lafayette Police Department testified on behalf of the state. Sergeant Gibson met with officers who responded to the scene in Evangeline Parish where the victim and his car were found. He took a statement from Ronald Morton, an eyewitness to the shooting of the victim in Lafayette. He further organized crime scene searches at the scene of the shooting in Lafayette Parish, and the site where the body and car were found in Evangeline Parish. Gibson's investigation revealed that Vince Moore's telephone had been used to page the victim shortly before the shooting. His investigation further revealed that the defendant was living at Moore's residence at the time of the shooting. Gibson also took two statements from the defendant, which will be discussed in greater detail below.

Ronald Morton, who testified on behalf of the state, was an eyewitness to the shooting in the parking lot in Lafayette Parish. Mr. Morton was sitting in the parking lot in his vehicle waiting for his brother-in-law who was at Eckerd's Drugs. His testimony was, in pertinent part, as follows:

> A. Okay. It was December 7th of 19 -- I think 1997. I was at Eckerd's Drugs off Pont Des Mouton and Moss Street. I was parked there, waiting for my brother-in-law at the Eckerd's Drugs to get some medicine; and while I was waiting for him in the car, I observed two (2) young men walking to a certain car. And when they got there, the little

5

guy that was in the car rolled the window down -- either rolled it down or he had power windows, and one of the little guys that was talking to him shot him, came up with a gun and -- he spoke to him about ten or fifteen seconds, maybe less than that, and then started firing, shooting the guy.

Subsequently, Morton testified about the shooting in greater detail:

A.  One of them had their hand in their pocket, coat pocket. And the other, I don*t believe he had his hand in his pocket. But they were walking together, not saying a word to each other till they got by the car. And then one of them went around to the passenger's side, and the other one stayed by the driver's side. And the little guy rolled the window down -- or, like I say, it could have been a power window, it wasn*t all the way down, and they spoke for about five or ten seconds, and he shot him five (5) times.

Q.  And what, if anything, did the other person do?

A.  Well, after the shooting, the person that was on the passenger's side -- they both got in the car at the same time after the shooting. After the little guy shot the other guy, they both jumped into the car.

Q.  Was there anything that was obstructing your vision, or did you have a clear view of everything?

A.  I had a clear view. There were no cars in front of me, and it was a clear day, a clear evening. There was nothing.

Q.  After the shooting occurred, did it appear that there was a violent exchange of words between the two individuals?

A.  No, sir. I don*t believe there was no words at all.

Q.  Did you see anyone, maybe the person who you saw shoot the gun, reach over the car to the other person who was on the other side and make a demand of some sort?

A.  No. No, I couldn't say that because the windows were tinted. You know, after he got in -- after the little guy got in the car on the passenger's side, I couldn't see him at all after that. But the guy who did the shooting, the window was still down; so it*s like he forced the guy he shot over some kind of way to push him out of the way so he could drive and take the car.

Q.  And would it be fair for me to say that immediately after the shooting, what you observed was the person on the passenger's side just jumped in the vehicle without hesitation?

A. Right. Yes, sir.

Q. What then happened?

A. Then he had problems -- the driver or the shooter had problems putting the car in gear some kind of way, because it jerked for about maybe a couple of seconds, and then he got it into reverse and backed out and went around to the back of the store, to go to the highway.

Q. That would be behind the little strip mall?

A. Right, behind the Eckerd's Drugs. They have a passage, you know, like a little street or something in back of the store where you could pass and get to the highway.

Morton testified he saw a nearby truck pull out at the same time the defendant and the shooter were "going to the back" in the victim's car. The truck turned left going to Moss Street, according to Morton, however Morton did not know where it went subsequently because he followed the victim's vehicle and called 911. When he reached 911 he was told to pull over and he complied.

On cross-examination, Mr. Morton was questioned about the statement given to police within two days of the shooting incident. He testified as follows:

Q. Now the other person with the shooter, did he appear to be angry at any time?

A. Not to my recollection, no, sir.

Q. Were you focused on him at all, or were you focused on the shooter?

A. Well, I was focused on both of them as they approached the car, but after the shooting went on, I was focused mostly on the shooter.

Q. And you testified that as the two of them approached the car, one had their hands in their pocket. Was that the shooter?

A. Yes.

Q. And they walked up to the car as if there was nothing unusual, nothing bothering them?

A. Right, you know, like a Sunday walk.

7

Q.     They didn't appear to be nervous at that time?

A.     Not walking to the car.

Q.     Now after the shots were fired, how did the shooter appear to you?

A.     Enraged.

Q.     How did the other person with him appear?

A.     Well, he seemed nervous, very nervous.

Q.     He hadn't been nervous before, but he was nervous then; is that correct?

A.     Right. When they were going it was, like I said, a Sunday walk. You know, both of them was calm until the shooting. And after the shooting, the -- who are you asking about, the shooter or the other guy?

Q.     The other guy.

A.     Well, when he went around the car, when he approached around the car, he looked a little bit nervous then.

Q.     After the shooting did he appear to be in shock?

A.     In a sense.  You know, they both jumped in the car at the same time.  You know, it was like a rush.

Q.     Do you recall giving the statement to the detective that we were talking about, where you said he paused like he was in shock, and  "he was stunned, and then he jumped in the car?"

A.     Most probably I did say that.

On redirect, Morton said, "If he was in shock, you know, I couldn't really say right off."

Then, on re-cross, the following colloquy occurred:

BY MR. BRAZEE:

Q.     Just a couple follow-up questions, Mr. Morton.  You gave a statement on December 9th of 1997, didn't you?

A.     It was -- I think it was a Monday.  If it was a Monday, then I think it was the 9th.

8

Q. And that was two (2) days after the incident?

A. One (1) day after -- no, no, it was two (2) days, because yeah, I went fishing Monday.

Q. And everything was pretty fresh in your mind at that time?

A. Oh, yeah.

Q. And we're five years later now, aren't we?

A. Yes, sir.

Q. And at that time you did tell the detectives or the detective that was interviewing you that Mr. Cooper was like he was in shock, he was stunned, and then he jumped in the car, didn't you?

A. Yes, sir.

Contrary to the dissenting opinion, nowhere in his testimony does Morton testify that the defendant's reaction was one of "surprise."

As previously noted, Sgt. Gibson took two statements from the defendant regarding this incident. On April 7, 1998, the defendant came in voluntarily and gave a statement. On April 8, 1998, the defendant's mother called Sgt. Gibson and advised him that the defendant was in jail and wanted to give another statement. Sgt. Gibson picked the defendant up at the jail and he gave a second statement. Both statements were recorded. The tapes of the interviews were played for the jurors who were also provided a transcript of the tapes to follow.

In his first statement, the defendant stated that Vince Moore wanted some marijuana, so the defendant paged the victim, who was a friend of his. Driven by Danny Smith, they proceeded to the Winn-Dixie parking lot to meet the victim, but when they got to the victim's car, Moore immediately shot him. The defendant told Sgt. Gibson he did not know Moore was carrying a gun and that he ran back to Smith's truck, which he described as being "dark, dark blue, it's almost black" and left

9

with him. When asked his opinion of why Moore shot the victim, the defendant stated Moore wanted the "big bag" of "weed" the victim had in his car. The defendant stated Moore told him this at some point after the shooting. He stated Moore also told him that he had burned the victim's car and other evidence.

In his second statement, given the day after the first statement, the defendant presented a different version. The defendant stated he and Moore were both at the driver's side of the victim's car, then, immediately after shooting the victim, Moore shouted for him to get into the car. According to the defendant, he got in the back seat, and they drove to Moore's residence. Later in the statement, the defendant said he got into the car on the "passenger side." This discrepancy was not explained. Once at his residence, Moore handed the bag of marijuana to his brother, Josh. According to the defendant, Josh was very upset to see the victim's dead body. The defendant also stated Moore retrieved a blanket from the residence. Smith arrived at some point, and the defendant got into his truck. Smith then led Moore to a field in Evangeline Parish. Once at the field, Moore drove to the back of it. The defendant stated that as he and Smith pulled up behind him, Moore jumped out of the car which was already on fire. The defendant was not sure how the fire started, but speculated Moore might have lit the blanket he had retrieved from the house, or might have lit one of the car's seats. Moore got into Smith's truck and they drove back to Moore's residence. According to the defendant, Moore gave half the bag of "weed" to Smith. He kept the other half. The defendant stated he had smoked some of it.

Forensic pathologist Dr. Emil Laga testified regarding the cause of death. Laga testified that he performed the autopsy on December 8, 1997. Laga found two bullets in the victim's skull which he described as "killing bullets," because of their path and location. He testified either bullet would ultimately result in the victim's death. Due

10

to the paths of the bullets, Laga testified the victim must have been looking to the right when they were fired. Laga found a non-fatal bullet that had entered the torso. Laga further testified that the evidence indicated the victim was still alive when the car was set on fire. Laga testified that the victim's blood contained traces of carbon monoxide, cyanide, and isobutyl alcohol. He explained the carbon monoxide and cyanide were both by-products of material burning in the car. The isobutyl alcohol indicated a solvent had been used as an accelerate for the fire. He further testified that the presence of these three substances in the blood stream indicated the victim inhaled them during the fire. On cross-examination, Laga specifically stated the bullet wounds would have killed the victim, not immediately, but over a period of time. When asked if the wounds would have caused him to "appear[] to have been dead," Dr. Laga responded that the victim would have been breathing and noted "breathing is one of the signs that you are still alive."

Herbert Zenon, Jr., the victim's brother, testified for the state. He established that the defendant was acquainted with the victim and that he had seen them together in the past.

The state's final witness was Vincent Moore, the shooter, who had previously pled guilty to the offense and had been sentenced. Moore acknowledged being a member of a gang known as the "Baby Blue Crips." He acknowledged being the defendant's best friend and that the defendant knew the victim. He denied knowing the victim himself. He further denied any knowledge of or participation in the crime. Moore was hostile to the state and verbally combative throughout his testimony.

As previously noted, when the issue of the sufficiency of the evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

11

have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). After reviewing the evidence presented at trial under the *Jackson* standard of review we find there is sufficient evidence to establish the essential elements of the crime of principal to second degree murder.

The jury was presented evidence that the defendant set up the meeting between himself, Vince Moore, and the victim. The defendant arrived at the Winn-Dixie parking lot with Vince Moore, the shooter, and they approached the victim together. Evidence was presented that when they approached the vehicle the shooter went to the driver's side and the defendant walked around the back of the car to the passenger's side. The testimony of the eyewitness to the shooting was that the two appeared very calm as they approached the vehicle, the defendant looking a bit nervous when he "approached around the car." The shooter was at the car window, at the most, for fifteen seconds when he pulled the gun from his pocket and shot the victim five times. The evidence showed he shot the victim twice in the back of the head, suggesting the victim's head was turned toward the defendant when he was shot. The eyewitness testified that when the shooting occurred the defendant appeared stunned, but further testified that the shooter jumped into the driver's seat and the defendant jumped into the back passenger seat at the same time, without hesitation. He heard no words spoken between them. According to the defendant's statement when he left the parking lot, he and the shooter, Vince Moore, took the victim's car back to Moore's house. The medical testimony established the victim was still alive at that time. The jury heard evidence that the defendant and the shooter were met at Moore's house by Danny Smith, the same individual who had taken them to the parking lot where the shooting occurred. The defendant got into the truck with Smith and accompanied him

12

as he led Moore, still driving the victim's car, with the victim still alive, to a remote area of Evangeline Parish where the car was set on fire with the victim, who was still alive, inside it. The jury heard evidence that the marijuana taken from the victim was divided between Moore and Smith, and that the defendant also shared in the use of the marijuana.

After examining the evidence presented, in a light most favorable to the prosecution, we conclude a rational trier of fact could have found the elements of principal to second degree murder proven beyond a reasonable doubt.

The appellant argues that the evidence is insufficient to prove the defendant had the requisite intent to commit the offense as the state failed to establish any specific intent on the part of the defendant to kill or inflict great bodily harm on the person of Earl Zenon. We find no merit in this argument.

Specific intent is a state of mind and can be proved directly as a fact or may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Turner*, 626 So.2d 890 (La.App. 3 Cir. 1993), *writ denied*, 93-3182 (La. 4/4/94), 635 So.2d 1122. Considering the evidence as a whole as set forth above, we find a rational trier of fact could have found the state proved the defendant had a specific intent to kill Earl Zenon or inflict great bodily harm upon him. The defendant set up the meeting. He accompanied the shooter to the scene. When the shooting occurred, he neither tried to stop it nor even said anything to the shooter which would indicate he was surprised. Instead, he immediately jumped into the vehicle with the shooter, no words having passed between them, and went back to the shooter's house with him in the victim's car with the victim still alive. He then accompanied the shooter, and the same man who took them to the scene of the shooting, to Evangeline Parish to dispose of the car and the victim. Subsequent to the disposal of the car and

13

victim, the defendant accompanied the shooter back to the shooter's house where they smoked marijuana that had been taken from the victim. The argument that the state failed to sufficiently prove the element of intent is without merit.

Further, we find the state produced sufficient evidence under the *Jackson* standard of review to establish their alternate theory, that the defendant was a principal to the offense of second degree murder, by proving the defendant was a participant in the armed robbery of Earl Zenon and that Mr. Zenon was killed in the course of that armed robbery.

Having determined there was sufficient evidence to affirm the verdict of the jury, we find no valid ground for the trial court to have granted the defendant's Motion for Post Verdict Judgment of Acquittal and/or Alternatively For a New Trial. We find no error in the denial of these motions.

In his third assignment of error the defendant argues the trial court should have granted mis motion for a mistrial because of improper statements by the prosecutor. Defense counsel moved for a mistrial during closing arguments, arguing the state impermissibly commented on the defendant's failure to testify and made an improper reference to a possible plea bargain. After hearing argument on the motion, the trial court denied the motion.

Louisiana Code of Criminal Procedure Article 775 provides in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

Louisiana Code of Criminal Procedure Article 770 provides in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by a judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

....

(3) The failure of the defendant to testify in his own defense.

We have reviewed the closing argument by the state. We find any references made by the state as to what the defendant did or did not say were all references to the statements given to the Lafayette Police which were admitted at trial. The state made no reference to the fact the defendant did not testify on his own behalf. The trial court did not err by denying a mistrial on this ground.

The defendant further objected to remarks made during rebuttal argument that referenced a possible plea bargain that had been offered to the defendant. During closing arguments defense counsel made the following statement.

> And I almost couldn't believe it when I heard a few minutes ago, when Mr. Johnson said no, he wouldn't deal with a homicidal killer. But they did, didn't they? They cut a deal with him. They allowed him to plead guilty to a lesser offense of manslaughter in return for a fixed sentence. So then guess what? Vince Moore, this homicidal maniac, described in exactly those terms by the D.A., will someday be eligible for parole, and yet the...

> MR. JOHNSON: Your Honor, may we approach the bench?
> [THERE WAS A DISCUSSION AT THE BENCH BETWEEN THE COURT AND ALL COUNSEL.]

> BY MR. BRAZEE: [Continuing] And yet, the way Scott is charged, if you find him guilty of being a principal to second degree murder, it's life imprisonment with no eligibility for parole, ever. Is there any justice in that?

On rebuttal argument, the prosecutor discussed the plea agreement with Vince Moore and then stated as follows:

> So does that mean Scott did not get an equal opportunity? Scott made the choice to let you make the choice of whether or not he was involved in second degree murder. We didn't have to be here today. Scott had an alternative; Scott chose not to take it. And in not taking it, Scott's lawyers want you to set it right for Scott. That's not your job...

Later in the argument he argued:

15

Ladies and gentlemen, they want you to throw your common sense and reason out the window. They want you to have sympathy for Scott because Scott helped me to convict Vince Moore, and in having sympathy for him, mandate that you give him a lesser sentence than Vince Moore. And maybe that's right, but that's something you have to decide. But Scott had that opportunity. Scott could have given himself less. Scott didn't have to put this case in your lap. And because Scott chose to do that, you didn't have to feel sorry for him..."

A contemporaneous motion for a mistrial was made by defense counsel. After hearing argument the trial court denied the motion.

Louisiana Code of Criminal Procedure Article 774 provides:

The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.

The argument shall not appeal to prejudice.

The state's rebuttal shall be confined to answering the argument of the defendant.

The state argued to the trial court that the defendant opened the door for argument pertaining to a possible plea agreement by suggesting in closing argument that Vince Moore was given an opportunity to plead to a lesser offense while the defendant was not. The state argued it had the right to respond to this argument. We agree. On rebuttal, the state had the right to answer the defendant's argument. *State v. Castille*, 590 So.2d 755 (La.App 3 Cir.), *writ denied*, 597 So.2d 1025 (La.1992); *State v. Smith*, 445 So.2d 521 (La.App 3 Cir.), *writ denied*, 449 So.2d 1346 (La.1984).

Even if the comment by the prosecutor was considered improper rebuttal, the court must be thoroughly convinced that the remarks influenced the jury and contributed to the verdict before a case will be reversed on the grounds of improper argument. *State v. Barrow*, 410 So.2d 1070 (La.), *cert. denied*, 459 U.S. 852, 103 S.Ct. 115 (1982); *State v. Jarman*, 445 So. 2d 1184 (La.1984). The trial court, after hearing argument by counsel, declined to grant the mistrial. After reviewing the

16

record as a whole, and the arguments of counsel, we are not convinced that the prosecutor's remarks, made in response to defense counsel's arguments, influenced the jury or contributed to the verdict. We find no error in the trial court's denial of the motion for a mistrial. This assignment of error lacks merit.

In the defendant's fourth assignment of error, the appellant argues that the trial judge erred by allowing Herbert Zenon to testify after he violated the rule of sequestration. During the course of the trial, the trial court brought Mr. Zenon into the court room and questioned him on the record as to whether he had violated the rule of sequestration. The trial court established that he had not discussed his testimony or the facts of the case with anyone. The trial court admonished Mr. Zenon not to discuss anything about the case with anyone. The trial court clearly acted properly and within its discretion by admonishing the witness. There was no objection to the court's actions by defense counsel. Mr. Zenon was later called as a witness. There was no request by defense counsel at anytime that his testimony be excluded because of a violation of the sequestration order. The defendant did object to certain questions posed to Mr. Zenon on the basis that his response would necessarily be hearsay. That objection was sustained by the court. The objection had nothing to do with whether Mr. Zenon should have been allowed to testify. No such objection was ever made. This assignment of error lacks merit.

In his final assignment of error, the defendant argues the trial judge erred by not replacing Juror #150, Joseph Floyd Zeno, when presented with evidence of the appearance of impropriety and bias on his part. It is clear from the record that the court was presented no evidence of any bias on the part of Mr. Zeno. The court was presented with an unsubstantiated rumor that Mr. Zeno might somehow be related to the victim. The source of the rumor was never made clear. The court properly

17

questioned Mr. Zeno, established the rumor was untrue, and that there was no bias or prejudice on Mr. Zeno's part in any regard. This assignment of error lacks merit.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find two.

The language of La.Code Crim.P. art. 873 requires a delay of at least twenty-four hours between the denial of a motion for new trial or a motion in arrest of judgment and sentencing. Court minutes indicate the defendant's Motion for Post Verdict Judgment of Acquittal and Alternatively, for a New Trial was denied just prior to his sentencing. There is no indication in the minutes that the defendant waived the sentencing delay, but the sentencing transcript is not contained in the record. However, any error would be harmless as the defendant received a mandatory life sentence. *See State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115; *State v. Williams*, 617 So.2d 557 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1331 (La.1993).

Second, the defendant was not informed of the two-year time limit for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court should be directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. *See State v. Fontenot*, 616 So.2d 1353 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1334 (La.1993); *State v. Courtney*, 99-1700 (La.App. 3 Cir. 5/3/00), 761 So.2d 112.

## DECREE

The defendant's conviction is affirmed. The case is remanded to the trial court

18

solely for the purpose of instructing the trial court to comply with La.Code Crim.P. art. 930.8.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS**.

STATE OF LOUISIANA

VERSUS

SCOTT ALLEN COOPER


THIBODEAUX, J., dissenting.


This case at best is one of circumstantial evidence. "When circumstantial evidence is used to prove the commission of the offense, La.Rev.Stat. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'" *State v. Bridgewater*, 00-1529, p. 2 (La. 1/15/02), 823 So.2d 877, 909-910 (on rehearing), *cert. denied*, ___ U.S. ___, 123 S.Ct. 1266 (2003). The scenario demonstrated by the State's evidence falls short of proving beyond a reasonable doubt either of the State's theories: (1) that Defendant specifically intended to kill the victim, or (2) that Defendant intended to participate in, aid, or abet an armed robbery, during which the victim was killed. Similarly, the evidence does not prove Defendant intended to participate in a carjacking, during which the victim was killed.

The facts advanced by the State demonstrate that Defendant could well have intended to consummate an illegal drug transaction, with no intent to rob or kill the victim. The evidence adduced by the State did not exclude such a hypothesis. Significantly, the lone eyewitness testified Defendant appeared to be shocked when the shooting occurred, while the shooter appeared to be enraged.

In *Bridgewater*, a jury convicted defendant of first degree murder, and he received a death sentence. On review, the supreme court quickly disposed of the theory that the defendant actually shot any of the victims. Proceeding to the theory that he was a principal to specific-intent felony-murder, the court observed:

> As a general rule, "liability [as a principal] will not flow merely from a failure to intervene;" however, "silence in the face of a friend's crime will sometimes suffice when the immediate proximity of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime." 2 Wayne R. LaFave and Austin W. Scott, Jr.,Substantive Criminal Law § 6.7(a)(1986)(Emphasis supplied). Defendant's statement that he was in the Beaugh's garage when the fatal shots were fired places him outside the "immediate proximity" of the double homicide and inside the general rule precluding a finding of liability as a principal based solely on a passive failure to intervene in a friend's criminal acts.

> Our finding that the evidence is insufficient to establish defendant's liability as a principal is buttressed by the state's failure to present any evidence establishing defendant's specific intent to kill. No one testified that defendant had anything more than a broken BB gun; indeed, as noted, it was defendant who conceded that much. Ms. Menard, the neighbor, observed no weapons on either of the suspicious pair. This lack of evidence that defendant even was armed with a functional weapon reduces the state's circumstantial case to a request that the jury engage in speculation based merely upon "guilt by association." *Pierre*, 93-0893 at p. 6, 631 So.2d at 429.

> Accordingly, we reject the state's contention that the jury reasonably could have found defendant liable as a principal based merely on his failure to prevent Jacobs from committing the double homicide. We hold that the state failed to exclude a reasonable hypothesis of innocence--that defendant was merely present--and, for that reason, we reverse defendant's conviction of first degree murder and death sentence.

*Id*. at 891.

In *State v. Pierre*, 93-0893 (La. 2/3/94), 631 So.2d 427, the defendant was charged with second degree murder in connection with the rape of a thirteen-year-old victim. The jury returned a lesser verdict of manslaughter.

In reversing the jury's verdict, the supreme court stated:

> The trial court properly instructed the jury according to these principles and jurors labored long and hard over the course of two days to apply them. In the end, however, rational jurors could only speculate about the defendant's role in Alexander's death. To the extent that the defendant could directly implicate Jones in the rape and murder of the victim, Jones's advice to him in the Avoyelles Parish Prison not to talk with Thomasie may have signalled nothing more than an attempt to influence and silence an eyewitness to the crime. The defendant's admissions to Thomasie placed him on the scene, and the details he provided about the rape of Alexander and the bludgeons used to kill him spoke for the reliability of those statements. Nevertheless, only Thomasie's notes made on January 7, 1992, provided any evidence that the defendant had been inside the abandoned house when the victim was raped. Thomasie's trial testimony contradicted those notes, and all of the evidence available to the jury placed the defendant in the van at the time the victim was brought outside wrapped in what became a shroud.
>
> Jurors had no direct or circumstantial evidence that the defendant counseled or procured the others to kill Alexander, or that he participated in the actual murder. Thomasie's testimony made clear that the defendant used the all-inclusive "they" even when referring in context to Courtney and Jones. Jurors knew from the extent of his self-contradiction and the testimony of David Antoine and Pierre Taylor that Jones lied in his trial testimony when he denied any involvement in the murder. Even if jurors disobeyed the court's cautionary instructions about the proper use of Jones's prior inconsistent statements, however, they could find no reliable answers in those statements about the degree of the defendant's involvement, if any. Jones testified at Hill's trial that the defendant opened the back door of his van when Hill and Courtney emerged from the abandoned house with the victim's body. In his statement of August 31, 1991, which broke the case, however, Jones indicated that Hill was the one who opened the rear door and that the defendant had remained in the front seat of the van, staring fixedly out of the windshield while the victim was then beaten to death on old Highway 1.

3

> The due process standard of review in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), preserves the role of the jury as the factfinder in the case but it does not allow jurors "'to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988) [quoting 2 C. Wright, Federal Practice & Procedure, Criminal 2d § 467 (2d ed. 1982) ]; *see also State v. Lubrano*, 563 So.2d 847 (La.1990). A jury's finding that the accused aided and abetted in the commission of the crime therefore "cannot be 'mere speculation based upon guilt by association.'" *State v. Schwander, supra*, 345 So.2d at 1175 [quoting *State v. Williams*, 310 So.2d 513, 515 (La.1975)]. The evidence at trial did not prove beyond a reasonable doubt that the defendant specifically intended to kill the victim so as to make him a principal in the crime.

*Id.* at 428-29.

*State v. Peters*, 553 So.2d 1026 (La.App. 4 Cir. 1989), a first degree robbery case, while superficially similar to this case, is instructive. Language in the court's *Jackson* review upheld the defendant's conviction as a principal because he had been seen in the gunman's company before the crime, approached the scene with the gunman and did not intervene, got into the victims' truck with the gunman, and was still in the truck with the gunman when police apprehended them approximately an hour after the offense. However, the case is distinguishable because the defendant acted as a lookout and distracted one of the victims. *Id.* at 1027-28. In the present case, the State theorized Defendant distracted the victim, as the two fatal bullets entered near the back of the victim's skull. However, the State offered no proof Defendant acted to make the victim turn his head.

Also, *State v. Johnson*, 440 So.2d 197 (La.App. 3 Cir. 1983), *writ denied*, 444 So.2d 1240 (La.1984), is worth noting. This court reviewed the defendant's conviction as a principal to armed robbery of a curb market. Defendant did not enter the store during the robbery, but he entered it with the two active participants in the robbery, three or four times before the offense. A witness saw him with the two

accomplices, lurking behind some bushes near the store, less than thirty minutes before the robbery. Shortly after the robbery, he retrieved some of the accomplices' clothing from the bushes and was seen running near the store with something in his arms. He took the clothing to one of the accomplices' homes, then drove the other men to another location. *Id.* at 198-99, 201. *Johnson* is distinguishable from the present case because of the evidence regarding the defendant's activity with the active participants before the robbery.

In surveying other jurisprudence related to the law of principals, I note that surprise, or the lack thereof, is sometimes mentioned as a factor in determining whether a defendant is a principal. *See, e.g., Bridgewater*, 823 So.2d at 891. As already noted, the lone eyewitness in this case stated Defendant appeared surprised by Moore's shooting the victim. In contrast, the shooter, Moore, appeared to be enraged.

More generally, courts reviewing principals cases look to evidence of actions preceding a given offense, during the offense, and after the offense. Often, the state is able to show a defendant helped plan the offense at issue, or knew of the plan before the offense, and elected to participate. See, e.g., *Peters*, 553 So.2d 1026, and *Johnson*, 440 So.2d 197. In situations of second degree murder, pursuant to armed robbery, the state can often at least show that a defendant accompanied the eventual killer, while knowing the other person was armed.

In the present case, the State proved little regarding events before the shooting. Although the State showed Defendant paged the victim shortly before the offense, the Defendant's statement explained that he contacted the victim to buy drugs. The State also showed the Defendant accompanied the shooter to the scene of the crime although no evidence was introduced to show his knowledge of the events about to unfold or even knowledge that Moore was armed.

5

Regarding what happened during the offense, the State proved Defendant got into the car and left with Moore immediately after the shooting. However, as already noted, the same eyewitness who provided the above information also acknowledged that Defendant looked surprised when Moore shot the victim. At best, what the State presented did not advance its case.

What the State proved regarding events after the shooting was more detailed, although still unclear on some points. After the offense, Defendant shared in the proceeds, as he acknowledged smoking some of the marijuana Moore took from the victim. Sharing in contraband can be an indication that a defendant acted as a principal. *State v. LeBlanc*, 94-0282 (La. 6/3/94), 637 So.2d 489. However, in *LeBlanc*, the prosecution also presented evidence regarding the various defendants' actions *before* and *during* the offense at issue. In *LeBlanc*, the defendant not only shared in the proceeds, but also was present in the getaway car, and later bragged about his participation. Thus, the court upheld his armed robbery conviction and sentence. However, the court set aside his attempted murder conviction as the evidence did not prove specific intent. The short opinion mentioned the murder was "apparently spontaneous," but did not elaborate. *Id.* at 489-90.

Similarly, the cases of *State v. [C.] Williams*, 01-1650 (La. 11/10/02), 831 So.2d 835; *State v. Logan*, 36,042 (La.App. 2 Cir. 6/14/02), 822 So.2d 657; *State v. Magee*, 00-2816 (La.App. 1 Cir. 10/10/01), 809 So.2d 452; *State v. [M.] Williams*, 34,359 (La.App. 2 Cir. 5/9/01), 786 So.2d 203, *writ denied*, 01-2275 (La. 5/10/02), 815 So.2d 835; *State ex rel. K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716; *State v. [E.] Williams*, 33-201 (La.App. 2 Cir. 5/15/00), 758 So.2d 1003, *writ denied*, 00-1784 (La. 4/27/01), 791 So.2d 111; *State v. Shaw*, 27,892 (La.App. 2 Cir. 4/3/96), 672 So.2d 237 and *State v. Stokes*, 26,003 (La.App. 2 Cir. 6/22/94), 639 So.2d 395, *writ denied*, 94-1880 (La. 11/11/94), 644 So.2d 387, all considered defendants' act of

6

sharing in proceeds or contraband from an offense as a *factor* in the La.R.S. 14:24 analysis. However, as in *LeBlanc*, each of these cases included evidence of the various defendants' involvement before and/or during the offenses at issue.

As already noted, the present case lacks evidence Defendant knew beforehand that a murder, robbery, or carjacking was to take place. During the offense, he showed signs of surprise; immediately after the shooting, he got into the victim's car and left with the shooter. This is the *sum* of the evidence regarding Defendant's actions before and during the offense. Therefore, it is easily distinguishable from the cases just cited.

Some jurisprudence also considers such post-offense factors as a defendant's failure to aid the victim, or to call the police. *See, e.g.*, *State v. Hayes*, 01-736 (La.App. 5 Cir. 12/26/01), 806 So.2d 816, *writ denied*, 02-0263 (La. 10/25/02), 827 So.2d 1169; *State v. Saylor*, 01-451 (La.App. 5 Cir. 11/27/01), 802 So.2d 937, *writ denied*, 01-3406 (La. 10/04/02), 826 So.2d 1122; *State v. Cazenave*, 00-183 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151. However, these cases are distinguishable because, in each of them, there was direct evidence the defendant acted as a getaway driver. Thus, unlike any of the cases cited thus far, the evidence in this case focused upon Defendant's actions *after* the offense.

As already noted, the evidence in this case supports a logical inference that Defendant intentionally aided in the hiding of the victim's car and body. Since Laga's testimony indicated the victim was still alive when the fire began, the question arises whether Defendant could be guilty of felony-murder pursuant to the victim's burning death. Neither of Defendant's statements demonstrated that he knew Moore would attempt to *destroy* the car. The circumstances indicate Defendant knew Moore

7

was going to conceal the evidence, but not that Moore was going to burn it. There is no evidence Defendant manifested an intent to kill.

As to Moore, the shooting and subsequent burning formed one continuous transaction; the facts indicate he intentionally shot the victim, then made an effort to destroy the evidence. *See, e.g. State v. Goodley*, 01-0077 (La. 6/21/02), 820 So.2d 478. However, as to Defendant, it would not be one continuous offense because he was not proven to be a principal to the initial offense, *i.e.*, the shooting and armed robbery. Defendant did not form criminal intent until *after* the shooting/robbery. Thus, the most he would be guilty of would be principal to a killing while he was acting as an accessory after the fact; in other words a felony-manslaughter. However, this was not the crime charged, nor argued to the jury.

Further, accessory after the fact would not have been available as a responsive verdict. La.Code Crim.P. art. 814 does not list accessory as a responsive verdict to murder or manslaughter. Accessory is defined by La.R.S. 14:25, which states in pertinent part:

> An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.

Considering the definition of a principal, the elements of an accessory charge do not present a lesser-included grade of a charge as a principal. Accessory clearly does not arise until after a felony has been committed; thus, it is an entirely separate offense, rather than a lesser grade of the offense. For this reason, a reduced verdict of accessory after the fact would not have been appropriate below, and is not available on appeal. The Louisiana Supreme Court has observed:

> Defendant was charged as a principal to the crime of second degree murder committed during an armed robbery.

8

> The only responsive verdicts to second degree murder are guilty, guilty of manslaughter and not guilty. Accessory after the fact is a separate and distinct crime. While the definition of principal is relevant to the crime charged, that of accessory after the fact is not.

*State v. Stacy*, 96-0221, p. 5 (La. 10/15/96), 680 So.2d 1175, 1178.

Thus, the victim's death in the burning car would not form the basis for a conviction in this case.

For the reasons discussed, the State failed to prove the elements of the crime beyond a reasonable doubt. Thus, the conviction and sentence should be vacated and set aside.

For the foregoing reasons, I dissent.

9