# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-285


STATE OF LOUISIANA

VERSUS

CHADWICK MCGHEE


**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 176957
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of James T. Genovese, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


**CONVICTION VACATED.**


**Charles A. Riddle, III**
**District Attorney, Twelfth Judicial District Court**
**Michael F. Kelly**
**Assistant District Attorney**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-5815**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Paula C. Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Chadwick McGhee**

**Chadwick McGhee**
**Louisiana State Penitentiary**
**Main Prison - Walnut 4**
**Angola, LA 70712**
**PRO SE**

**GREMILLION, Judge.**

In September 2013, the victim, Jessica Guillot, went missing and has never been found. On November 14, 2013, Defendant, Chadwick McGhee, was charged by bill of indictment with one count of second degree kidnapping, in violation of La.R.S. 14:44.1. The bill of indictment also charged four co-defendants with the same crime: Asa Bentley, Donnie Edwards, Tamika Williams, and Willie Lee Price, Jr.[1]

Following a jury trial, Defendant was found guilty of the lesser included offense of simple kidnapping, in violation of La.R.S. 14:45. At that time, the State announced its intent to file a habitual offender bill against Defendant. Defense counsel then objected to the verdict, and court was adjourned.

On October 30, 2014, a hearing was held on Defendant's Motion for New Trial. Defendant argued for a new trial on two grounds: the verdict was contrary to the law and evidence, and the discovery of new and previously unavailable evidence regarding the role Tamika Williams played in the entire incident. The trial court denied the motion.

On November 12, 2014, Defendant was adjudicated a fourth felony offender and sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant's appeal of that sentence is addressed in the companion filing bearing docket number 15-286.

Defendant appeals his conviction, raising three assignments of error through counsel: (1) the evidence was insufficient to support his conviction; (2) the trial

---

[1]The spelling of various names change throughout the transcript, particularly that of Tamika Williams. As such, we use the spellings of the co-defendants' names as they appear on the bill of indictment.

court erred in denying his motion for new trial; and (3) the trial court erred in admitting out-of-court statements made by Asa Bentley, a co-defendant, who was not subject to confrontation. In addition to the assignments of error presented by counsel, Defendant has filed a pro se brief raising the following assignments of error: (1) he was denied his right to appellate review and a complete record; (2) he was denied his right to testify on his own behalf; and (3) his trial counsel provided ineffective assistance of counsel by failing to object to the introduction of evidence of other crimes.[2] For the following reasons, Defendant's conviction is vacated.

## FACTS

The State called six witnesses to testify at trial: Laura Stelly, the victim's mother; Cecil Cooper, the victim's fiancé; James Crystal; Tamika Williams, one of the co-defendants; Detective Roland Patterson of the Avoyelles Parish Sheriff's Office; and Detective Jeremiah Honea of the Avoyelles Parish Sheriff's Office.

Stelly testified that the last time she saw her daughter was September 7, 2013, when the victim dropped off her daughter, Javaia, with Stelly. Stelly later reported her daughter missing on September 11, 2013. Stelly also testified that Bentley came by her house between the time she last saw her daughter and when she reported her missing. She testified that Bentley was looking for her daughter because "she had got him for $175." Stelly testified that, after Bentley came to her house, she went to her daughter's house and found it "turned over" or ransacked. Finally, Stelly testified that it was not a new occurrence for her daughter to disappear, but that she always checked on her kids and came home after a few days.

---

[2]This court treated Defendant's first pro se assignment of error as a motion to supplement the record with a transcript of voir dire and ordered the trial court to provide a copy of the transcript of voir dire. The trial court complied with that order.

On cross-examination, Stelly testified that Bentley came to her house on a Saturday morning, but that she did not know the specific date. She reaffirmed her direct testimony that after speaking to Bentley she went to her daughter's house and found it ransacked, yet nonetheless waited a few days before reporting the victim missing. She also confirmed that her daughter had a drug problem, would disappear for days at a time, and had been locked up twice for "flipping out."

The State then called Cecil Cooper, the victim's fiancé, to testify. He testified that he and the victim had been dating and living together for about three years, that they had a daughter together named Javaia, and that he was aware of the victim's drug problem. He testified that the victim would sometimes disappear, but never for more than a night. He stated that the last time he saw the victim was September 6, 2013, after work. They were going to watch a movie, but he fell asleep, and she was not home when he woke up the next morning.

Cooper testified that on Saturday, September 7, 2013, he was sent home from work early, but did not have a car, so he was waiting on a ride home when Bentley and Defendant came by and agreed to give him a ride home. He identified Defendant in court. Cooper began giving testimony as to what both Bentley and Defendant said while they were driving him home. Cooper testified that Defendant kept repeating that something had happened and Cooper's "girl [was] down bad for what she did." Cooper stated that he took Defendant's comment about "[his] girl" to mean the victim. Cooper also testified that Bentley then told him that the victim had stolen Bentley's cocaine, and that someone was going to pay. Cooper stated that he told Bentley he would call the cops, went into his house to find it ransacked, and at that point Bentley fled the scene, hitting a car that was in Cooper's yard in the process. Finally, he stressed that although the victim would

3

often disappear for a night, she was never gone multiple days, and that he had not heard from her since September 6, 2013.

On cross-examination, Cooper mostly affirmed his prior testimony and acknowledged that he knew that the victim had a drug problem and was still using drugs when she went missing.

The State then called James Crystal, who testified that he saw the victim by a shed where he was living, on September 7 or 8, 2013, and that he texted Bentley so that Bentley could get "his stuff back," meaning the cocaine that the victim had stolen. Crystal identified Defendant in court, stating that Defendant was with Bentley when he came to the shed looking for the victim. Crystal then gave testimony that a Mexican individual came to the shed, left, and Bentley and Defendant left shortly thereafter. On cross-examination, he reiterated that the victim was gone before anyone got to the shed.

The State then called Tamika Williams, a co-defendant. Williams admitted to having a drug problem that has lasted for a couple years, primarily cocaine and pills. Williams stated that she knew both Bentley and Defendant, whom she identified in court. She testified that she had been in a sexual relationship with Bentley, who was also her cocaine dealer. Williams stated that she had known Defendant for over thirteen years, that she saw Bentley on a daily basis, and that Defendant was almost always with Bentley. She testified that she knew the victim because the victim's son had the same father as Williams' two daughters.

Williams described a phone conversation she had with Bentley on September 7, 2013, where Bentley told her the victim had stolen money and cocaine from him the night before, that he wanted it back, and that if he found the victim he was going to kill her. She then described an incident where she was

4

riding with Bentley, they saw the victim on a back road, and he jumped out and chased the victim but was unable to catch her.

Williams then testified that a few nights later, Bentley picked her up at her apartment in Simmesport, and they drove along Louisiana Highway One towards Mansura. She testified that Bentley was speaking to his brother, Willie Price, and that they met up with Price in front of the Y-Not-Stop in Mansura. Williams stated that Price, Donnie Edwards, Defendant, and the victim were all in the same car, and that Price and Edwards dragged the victim out of the car and handed her over to Bentley, who dragged her to the Dodge Durango in which he and Williams had driven to Mansura. According to Williams, Defendant did not move or get out of the car during this time.

Williams testified that after throwing the victim into the back of the Durango, Bentley positioned himself on top of her. She further stated that Bentley began choking the victim, telling her that he wanted his money back or he was going to kill her, and the victim kept begging him not to kill her. Williams stated that Edwards began driving the Durango, and that they were following Price back towards Simmesport. She described hearing choking sounds and what sounded like someone being hit, but said that she did not see anything because she was texting her sister and did not look in the back. She stated that the sounds continued for about ten or fifteen minutes, that she heard the sound of glass breaking, and then smelled something funny, "[l]ike somebody went to the bathroom on their self." Williams said she was then dropped off at her apartment, where she picked up her child and went to her mother's house in Odenburg.

Once she arrived at her mother's home, Williams received a call from Bentley, and shortly thereafter Bentley, Edwards, Price, and Defendant arrived at

5

Williams' mother's house in the Durango. Williams stated that Defendant had his head down "like he was crying or sad or something," and that Bentley told him, "You know anything I tell you to do you do it." At that point, all of the males left, and Williams went inside.

Williams further testified that the following day, Bentley took her to a nearby field where he claimed he had dumped the victim's body, but Williams got scared and refused to go see the body. Bentley told her he had to move the body. She then testified that she first contacted the police, pretending to be her friend Benita Robinson, and told them that "Tamika knew what happened." Williams also admitted that the first time she was interviewed, she lied about having been in the Durango because she was afraid she would get in trouble.

On cross-examination, Williams again admitted that she had previously been convicted of forgery and that she lied to the police during her initial interactions, giving a false name when she called and pretending she was not present during the incident between Bentley and the victim. She also admitted that during her first interview with the police, she never indicated that Defendant was even present during the incident. Williams admitted that she had no idea how the victim ended up in the car with the Defendant and the other before being dragged to the Durango, what happened after she was returned to her apartment, and again admitted she did not actually see what had happened in the Durango.

After defense counsel pointed out that Williams had reached an agreement with the State to testify against all of her co-defendants in exchange for being released from incarceration after her co-defendants' trials were finished, the State's rebuttal consisted of having Williams confirm that the plea agreement called for "truthful testimony."

The State then called Detective Roland Patterson of the Avoyelles Parish Sheriff's Office. Detective Patterson stated that he was involved in the interview of Defendant, whom he identified in open court. Detective Patterson then testified that prior to the interview, Defendant was read his rights and signed the "Standard Miranda form" indicating that he understood his rights, which had been read to him, and that he chose to waive those rights in order to give a statement. Finally, he stated that prior to Defendant's interview, no threats or promises were made to Defendant.

The State then called Detective Jeremiah Honea of the Avoyelles Parish Sheriff's Office. Detective Honea testified that the victim's body was never found. He further stated that the Durango that Williams spoke of at length during her testimony had been sent to Baton Rouge for forensic tests, and that no forensic evidence was found inside the car. Detective Honea then described five photographs of the vehicle and stated that Tomeka Mason, Bentley's live-in girlfriend and the owner of the Durango, had filed a report with the Simmesport Police Department on September 10, 2013, regarding the vehicle having been vandalized.

Detective Honea stated that their "break" in the case came when Williams called in pretending to be Benita Robinson and told police that Williams had information about the victim. Like Detective Patterson, Detective Honea identified Defendant in open court and testified that he interviewed Defendant and that Defendant signed a waiver of his rights prior to the interview.

The State moved to admit Defendant's prior interview into evidence, but defense counsel objected on the basis that it was not freely and voluntarily given. The trial court recessed the jury to determine if the interview was freely and

7

voluntarily given, while under the impression that the interview contained a confession. After the jury was returned to the courtroom, the trial court informed them that the video was not a confession, but merely an interview Defendant gave to detectives, and that they should give whatever weight they felt it deserved, as they would any other witness. The entire interview was then replayed for the jury.

The interview contained a long story told by Defendant to Detectives Patterson and Honea in which Defendant claimed he saw the victim at a barbecue around the time she disappeared, that he saw her leave the barbecue, and that he had not seen her since. He specifically denied ever being in a car with her in the Mansura area. He stated everything was "cool," that he had no knowledge of the victim taking anything from Bentley, and that people asked him the next day if he had seen the victim. Defendant stated that he had ridden in a car with Price before but just for errands. Defendant vehemently denied any knowledge of why Bentley was looking for the victim, claiming that Bentley never told him why he was looking for her.

On cross-examination, Detective Honea again testified that the Durango in question was tested for evidence, and no evidence was found. He also admitted that despite searching multiple other vehicles, there is no forensic evidence linking Defendant, or any of the co-defendants, to the case. He admitted that the entire investigation was based on what they were told by Williams, noting that her testimony and information has changed as time has progressed. Finally, he admitted that the only evidence, other than Williams' testimony, that any incident ever occurred between Simmesport and Mansura was the broken window in Mason's car, which was reportedly vandalized.

On re-direct, Detective Honea testified that when Mason reported the car vandalized, she told him that Bentley had been driving the car the night before. At that point, the State rested its case. Closing arguments were presented. After the State concluded its argument, defense counsel moved for a mistrial on the basis of La.Code Crim.P. art. 770(2), which mandates a mistrial on the grounds of introduction of "other crimes" evidence. The trial court denied this motion because evidence related to the ransacked house had been introduced without objection during trial.

**ASSIGNMENT OF ERROR NUMBER ONE AND
PRO SE ASSIGNMENT OF ERROR NUMBER TWO**

Counsel's first assignment of error, and Defendant's second pro se assignment of error, is that the evidence was insufficient to support Defendant's conviction for simple kidnapping, in violation of La.R.S. 14:45. Simple kidnapping is defined as "The intentional and forcible seizing and carrying of any person from one place to another without his consent." La.R.S. 14:45(A)(1).

The analysis for an insufficient evidence claim is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant argued that the evidence, when viewed in the light most favorable to the State, shows only that he was present when Bentley and the other individuals actually committed the kidnapping of the victim. The State responded that Defendant was convicted as a principal to the kidnapping. Since no evidence was ever presented during trial that Defendant forcibly seized or carried the victim, the jury's verdict of guilty of simple kidnapping appears to agree with the State's argument that Defendant was convicted as a principal.

Under La.R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." As stated, no evidence was introduced that established that Defendant personally committed the offense, or that he counseled or procured another to commit the crime. As such, Defendant could only be a principal if the State proved that he did "aid and abet" in the commission of the offense. *See* La.R.S. 14:24.

"[A]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *State v. Brooks*, 505 So.2d 714, 717 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337 (1987). Additionally, "[i]t is not enough to find merely that his coconspirator or accomplice had the necessary mental state, since this intent cannot be inferred to the accused." *State v. Holmes*, 388 So.2d 722, 726 (La.1980). As previously noted by the supreme court, this court "must evaluate the evidence in a light most favorable to the [S]tate and determine whether [a] possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable

doubt." *State v. Mitchell*, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83 (citing *State v. Davis*, 92-1623, (La. 5/23/94), 637 So.2d 1012, *cert. denied*, 513 U.S. 975, 115 S.Ct. 450 (1994)). We find that the State has failed to prove the mental intent necessary to find Defendant guilty of simple kidnapping.

Viewing the evidence presented at trial in a light most favorable to the State, it is apparent that the State presented evidence which showed the intent of co-defendants Bentley, Edwards, and Price to kidnap the victim. Under La.R.S. 14:11, "in the absence of qualifying provisions, the terms 'intent' and 'intentional' have reference to 'general criminal intent.'" As such, simple kidnapping is a general intent crime. The question in this case is whether the State proved beyond a reasonable doubt that Defendant, the only defendant actually on trial, had the necessary intent to be a principal to that kidnapping. Since the *Holmes* court prohibits inferring the intent of one co-defendant to another, the State must prove that Defendant had the intent to aid or abet in the kidnapping of the victim. The State has failed to meet this burden of proof.

The State presented evidence from two separate witnesses that Defendant was with Bentley when he was looking for the victim. Viewing the testimony of both Cooper and Crystal in the light most favorable to the State, the testimony established that Defendant knew Bentley was looking for the victim, but fails to identify how Defendant would have known that Bentley intended to kidnap and possibly do physical harm to her. Cooper testified that Bentley told him "somebody was going to have to pay [Bentley] his money, that somebody was going to get hurt." This is the only testimony that could possibly have provided proof that Defendant knew Bentley intended to harm the victim, a statement that

11

could easily have been seen as an attempt to intimidate her fiancé into paying Bentley for the cocaine he claimed the victim stole from him.

Williams testified that Bentley told her on multiple occasions that he was going to kill the victim if he found her; however, those conversations took place between Williams and Bentley, with no evidence that Defendant had any knowledge of them at all. Williams also testified that when Edwards and Price handed the victim over to Bentley in Mansura, Defendant never moved to help, he remained in the other car while Bentley allegedly choked the victim to death in the back of his girlfriend's Durango, and he "had his head down like he was crying or sad or something."

The State argues that it proved that Defendant had the intent to provide aid to Bentley during the kidnapping because, after the incident took place, Bentley made a comment to Defendant that "Whatever I tell you to do, you do it." However, when asked whether that comment was made in a joking fashion or if it was a threat, Williams' response was, "It wasn't in no [sic] joking way." Additionally, there is no indication what the "it" Bentley referred to actually was. Louisiana courts have frequently held that mere presence during a crime does not make an individual a principal to the crime; however, it is sufficient encouragement that the accomplice is standing by ready to give some aid if needed, provided the principal is actually aware of the accomplice's intention. *See State v. Acker*, 12-1116 (La.App. 3 Cir. 4/3/13), 111 So.3d 535; *State v. Anderson*, 97-1301 (La. 2/6/98), 707 So.2d 1223; *State v. Mason*, 10-284 (La.App. 5 Cir. 1/11/11), 59 So.3d 419, *writ denied*, 11-306 (La. 6/24/11), 64 So.3d 216. The State, therefore, relies on what appears to be a threat from Bentley to Defendant to

12

support its argument that Defendant was a principal to the kidnapping of the victim.

While the State may have proven the co-defendants had the intent and performed the actions which would constitute kidnapping the victim, it failed to prove that Defendant was guilty of anything other than being in the same place as his friend, Bentley. At most, the State proved that Defendant was present when the victim was kidnapped and failed to stop the kidnapping or report it to authorities, so-called misprision of a felony. However, while misprision may be unsavory, it ceased to be a crime in Louisiana after 1942. *See State v. Jackson*, 344 So.2d 961 (La.1977), *disavowed on other grounds by State v. Chism*, 436 So.2d 464 (La.1983).[3]

In conclusion, the evidence presented at trial, when viewed in the light most favorable to the State as required by *Jackson*, failed to prove that Defendant had the requisite intent to kidnap the victim.[4] As Louisiana law does not entertain the notion of "guilt by association," Defendant's conviction is vacated as having been supported by insufficient evidence. *See State v. Schwander*, 345 So.2d 1173 (La.1977) (citing *State v. Williams*, 310 So.2d 513, 515 (La.1975).

---

[3]Misprision is now only a crime in relation to treason. La.R.S. 14:114.

[4]Defendant was initially charged with second degree kidnapping, and the jury was additionally informed of responsive verdicts of attempted second degree kidnapping, simple kidnapping, and attempted simple kidnapping. All of these crimes require the general criminal intent to forcibly seize and carry a person from one place to another without her consent. Failure to prove that intent with regard to simple kidnapping would therefore render it impossible for the State to have proved any of the other responsive verdicts.

**REMAINING ASSIGNMENTS OF ERROR**

Because Defendant's conviction is vacated, Defendant's remaining assignments of error, both counsel-filed and pro se, are rendered moot and need not be addressed.

**DECREE**

Defendant's conviction is vacated.

**CONVICTION VACATED**.